**BRENDONWOOD COMMON, Appellant (Plaintiff Below),**

v.

**William E. FRANKLIN, Evelyn S. Franklin, Wolford T. Gradison, Graham's Furniture, Inc., Fred W. Kohlmeyer, Betty Kohlmeyer, Donald C. McCallum, Beverly McCallum, John Prendergast, Jean Prendergast, Mrs. Virginia Reibel, Mrs. Mildred M. Spaan, Appellees (Defendants Below).**

No. 2–278A60.

Court of Appeals of Indiana, Fourth District.

May 13, 1980.

Rehearing Denied June 10, 1980.

Daniel E. Johnson, Baker & Daniels, Indianapolis, for appellant.

Ronald W. Polston, Indianapolis, for appellees.

YOUNG, Judge.

Brendonwood Common, a not-for-profit corporation, began this action to collect delinquent assessments from several of its members, each of whom owns one or more Brendonwood lots fronting on 56th Street (Brendonwood's southern boundary). These members resisted collection and sought declaratory relief that the covenants requiring all lot owners in Brendonwood to maintain memberships in Brendonwood Common and to pay its assessments had become unenforceable as to their lots. Thus this case combines Brendonwood Common's efforts to collect delinquent assessments from seven of its members with a challenge by those seven members to the underlying validity of Brendonwood's assessment system.

On September 12, 1975, Brendonwood Common, sued ten of its members to collect delinquent assessments levied by the corporation upon them as their share of its expenses in managing and maintaining the

Brendonwood neighborhood. Its complaint sought as to each member the principal amount of the delinquent assessment, plus a reasonable attorney's fee, and foreclosure and order of sale of the members' Brendonwood properties because the delinquent assessments were liens upon their properties. The members raised an affirmative defense that Brendonwood's covenants requiring them to maintain memberships in the corporation and to pay its assessments on an acreage basis "are no longer in force and effect due to the fact that there has been such substantial and radical changes to the neighborhood surrounding Defendants' property, that enforcement of the restrictions would be unequitable [sic] to Defendants and all other property owners similarly situated." Thereafter, the members filed a cross-petition for declaratory judgment urging the trial court to "do equity" between them and the corporation by finding that the acreage assessment technique charged them too much in relation to the benefits that they received from it. The members amended their answer and cross-petition in order to expand their request that the trial court relieve them of the covenants and acreage assessment technique as to their lots and urged, as well, that they had since withdrawn from the Brendonwood Common. By reply Brendonwood Common denied the members' pertinent factual allegations. The parties stipulated the great bulk of the evidence and limited their evidence at trial to the single issue of whether Brendonwood Common's services had changed sufficiently to make the acreage assessment technique unenforceable as to the members.

From a judgment declaring the covenants no longer enforceable as to these members, Brendonwood Common appeals contending that:

(A) The trial court erred in concluding that changed conditions had rendered un-

enforceable as to the members' lots a set of covenants requiring all lot owners to maintain memberships in Brendonwood Common, pay assessments made on an acreage basis to meet its expenses in maintaining the common areas;

(B) The trial court erred in concluding that the members had effectively withdrawn as members of Brendonwood Common;

(C) The trial court erred in failing to order the sale of the members' properties in Brendonwood when it found delinquent assessment liens to be enforceable against their respective tracts;

(D) The trial court erred in failing to award Brendonwood Common interest and a reasonable attorney's fee.

A 350-acre parcel of real estate located on the south bank of Fall Creek in the Fall Creek Valley was platted as Brendonwood, "a self-regulated residential zone," on August 22, 1917. The addition consisted of 110 lots, various private roadways, paths and the like and one public road.

Brendonwood's covenants were put of record in a September 13, 1917, deed from Montgomery and Helen Lewis to Charles Lewis. That deed required Charles Lewis to organize Brendonwood Common as a corporation, to convey the common properties of Brendonwood (exclusive of its 110 lots) to the corporation, to provide for 110 memberships in the corporation with each membership appurtenant to one of the 110 lots and transferable only to successive purchasers of each lot, and to cause the corporation's articles and bylaws to provide for a system of rules and regulations permitting the assessment and collection of charges against each owner for the maintenance, care, and protection of the common areas. By provision in the deed, the covenants were to run with the land and bind Charles Lewis himself, his heirs, and his assigns.[1]

---

1. After the conveying language of the deed and the legal description the following clause appeared.

 Subject to the following conditions and the following covenants, stipulations and agreements, each and all of which covenants, stip-

ulations and agreements are to have the effect of a covenant running with the land; and by his acceptance of this Instrument of Conveyance the said Charles S. Lewis binds himself, his heirs and assigns, to perform, fulfill, abide by and carry out each and every of said

Charles Lewis thereafter organized the corporation (Brendonwood Common), conveyed the common properties to it, and recorded the corporation's articles. As recorded, the articles stated that the corporation was to provide in its bylaws for the maintenance of Brendonwood and that maintenance charges should be levied against each lot owner and become enforceable against their properties as liens. Contemporaneously, the corporation adopted bylaws that have not since been amended. As found by the trial court, those bylaws require the assessment of maintenance, development, and improvement charges to lot owners on an acreage basis and provides for the collection of such charges by their foreclosure as liens. In addition, the bylaws provide that the costs of some services should be assessed and collected on a per lot basis.[2]

Charles Lewis subsequently conveyed the 110 lots. Eight of these were conveyed to members' predecessors in title, and each such conveyance made explicit reference to the deed from Montgomery and Helen Lewis to Charles Lewis and stated that the grantee, by acceptance of the deed, took the lot subject to the covenants, conditions, and agreements set forth in the Lewis' deed. Moreover, each member had notice of the Lewis deed either in the abstract of title furnished at the time of such member's purchase or as an exception in that member's title insurance policy.

In 1974 Brendonwood Common's board decided that proper maintenance of its roadway system necessitated an application of slurry seal and that the cost of the application should be spread among its members by the acreage assessment technique provided by the maintenance provisions in the bylaws. The cost of the application was approximately $31,000.00. None of these members have paid this special

covenants, stipulations and agreements, and, further, at all times to acquiesce in the intent of the above grantors to make, have and keep all of said covenants, stipulations and agreements as to each of said one hundred and ten Plots and the successive owners thereof while in possession, but not in perpetuam, covenants running with the land; to wit:

. . . .

Following this clause were three paragraphs. The first and second required the grantee to incorporate and prepare the bylaws for Brendonwood Common. The third paragraph specifically lists several restrictions and again states they are covenants to run with the land, mentioning the corporation of Brendonwood Common and the general plan adopted earlier in the deed.

2. The relevant portion of the bylaws is as follows:

Brendonwood Common will have charge of the up-keep, maintenance, development and further improvement of said roads, drives, lanes, paths, ways and The Mall, and the decision of said Brendonwood Common upon all matters pertaining to the up-keep, maintenance and development thereof shall be conclusive and final, but before proceeding with any work of further improvement the said Brendonwood Common shall procure in advance the written approval of the owners of one hundred (100) plots as certificate holders; the entire cost of such up-keep, maintenance, development and further improvement shall be paid by the owners of all the plots in said Brendonwood Addition in the proportion that the superficial area of their respective plots bears to the total area of all the plots as shown in the plat of said Brendonwood Addition, as recorded in Plat No. 18 at page No. 14, as from time to time bills of such cost shall be made out by said Brendonwood Common and presented to said owners of plots for payment; and the amount of each and all such bills of cost is in the nature of an assessment against the land in the plot to the owner of which the bill is presented, and the payment of each and all of such bills is secured by a lien on such plot which, after sixty days default in payment by the plot owner after presentation, may, at the election of Brendonwood Common, be foreclosed in any court of competent jurisdiction by the said Brendonwood Common as plaintiff, with interest, attorney's fees and costs. And in like manner the said Brendonwood Common shall make and collect and have liens for assessments for the payment of all taxes, municipal assessments, or any other governmental charges that may at any time be laid upon or against the property of said Brendonwood Common, or the said corporation itself, and for the equitable reimbursement to any owner of a plot of any sum, not including interest or costs, which has been paid for any municipal or other governmental assessment for benefits to his plot resulting from any highway improvement, sewer construction or other public work. The liens of such assessments shall be subordinate at all times to the lien of any bona fide mortgage upon any plot.

roadway assessment, and some have also refused to pay Brendonwood Common's other regular assessments. Following the filing of this lawsuit, the members submitted written resignations of their interests in Brendonwood Common.

## A.

 The trial court determined that Brendonwood's covenants were binding and enforceable but abrogated future enforcement of the covenants upon member's lots. In order to accomplish an abrogation, there must be a "change of conditions" in the restricted area "so radical in nature as to defeat the original purpose of the restrictive covenants." *Bob Layne Contractor, Inc. v. Buennagel*, (1973) 158 Ind.App. 43, 301 N.E.2d 671, 678. *See also Highland v. Williams*, (1975) 166 Ind.App. 492, 336 N.E.2d 846; *Sorrentino v. Cunningham*, (1942) 111 Ind.App. 212, 39 N.E.2d 473; *Bachman v. Colpaert Realty Corp.*, (1935) 101 Ind.App. 306, 194 N.E. 783. In *Sorrentino v. Cunningham, supra*, for example, the defendant argued that a restrictive covenant prohibiting the sale of liquor in Irvington, a community on Indianapolis' east side, should no longer be enforced because of changes in conditions. Specifically, the defendant argued that much of the neighborhood on East Washington Street had developed into a commercial center, that several taverns operated from premises adjacent to the restricted area, that the area had been annexed into Indianapolis since the restrictions were imposed, and that the imposition of the restrictions would depreciate his property by $12,000 in value. Nevertheless, the court enforced the restriction against

liquor because it was for the benefit of all lot owners in the area, and other lot owners were still in a position to benefit from it. 39 N.E.2d at 478. Similarly, in *Bob Layne Contractor, Inc. v. Buennagel, supra*, the court held that the construction of a superhighway along one edge of a restricted residential area was not a sufficient change of condition to abrogate restrictions against commercial development in favor of lots abutting the highway. In *Sorrentino* and *Bob Layne*, the courts upheld the restrictions because the benefits of the plan could still be realized by the property owners in the restricted area. *See* 2 American Law of Property § 9.39 (A. Casner ed. 1952). In concluding that the location and size of defendants' lots coupled with the increased burden of road maintenance relative to other costs justified the abrogation of restrictions, the trial court erred.

The changes found to be of such a nature as to abrogate the covenants are that the City of Indianapolis has expanded to include this as a part of the metropolitan area, the roads are now a hard surface instead of dirt and gravel, and the vicinal reservation has been turned over to a private country club whose membership does not include all members of the corporation. Also the costs of maintenance have increased.[3] The change in conditions is not so radical as to defeat the original purpose of the covenants.[4] The trial court erred in abrogating the restrictions upon the members' lots.

Despite the trial court's judgment abrogating future enforcement of the covenants, appellee also argues on appeal that the covenants were invalid from their be-

---

**3.** The trial court included a finding that the cost of rebuilding the road system would be $200,000. This action had not been undertaken at the time this case was decided and we do not consider it relevant to the judgment at this time.

**4.** Appellee argues the cases relied upon are distinguishable because they all involve restrictive covenants and the covenants here impose positive burdens or affirmative duties on the members. Appellee contends the same standard applies but it should be considered in light of the distribution of affirmative burdens and

not restricting the use of land in the area. No cases from Indiana are cited on this point, however. The commentators and courts seldom make this distinction and some have held it immaterial. Annot., 68 A.L.R.2d 1022, 1027 (1959); 2 American Law of Property § 9.36 (A. Casner ed. 1952). While this argument has some relevancy in this case, we are not persuaded that the change in conditions shown is so radical to require abrogation of the common design even in light of the distribution of affirmative burdens.

ginning. They argue specifically that they were never intended to run with the land, that the covenants were created in violation of the Statute of Frauds, or that they released shortly after their creation.

■ The general rule regarding affirmative burdens imposed by covenants is that they run with the land where the necessary requirements are satisfied. 2 American Law of Property § 9.36 at 439 (A. Casner ed. 1952); Annot., 68 A.L.R.2d 1022, 1026–27 (1959). A covenant is capable of running with the land when there is an intention by the grantor that it so run, privity of estate between subsequent grantees of the original covenantor and covenantee, and the covenants touch and concern the land. *Conduitt v. Ross*, (1885) 102 Ind. 166, 26 N.E. 198, 199. The covenants in this case amply satisfied the requirements for running with the land. The original parties intended the covenants to run with the land because the Lewis' deed explicitly expresses that they shall run and bind all subsequent grantees. The members argue that the original parties to Brendonwood's restrictions, Montgomery and Charles Lewis, never intended the restrictions requiring membership in Brendonwood Common and the sharing of its expenses to run with the land. As discussed earlier, the deed from Montgomery to Charles Lewis had three subdivisions and a preamble that prefaces and applies to each of the subdivisions which followed. The trial court found that the original parties did intend for the affirmative covenants to run with the land. We will not disturb the trial court's finding on intent.

■ The members' argument that Brendonwood's restrictions were invalid from their inception for failure to comply with the Statute of Frauds, IC 1971, 32–2–1–1 (West 1979) has been specifically rejected. The acceptance of a deed poll (a deed signed only by the grantor) satisfies the Statute of Frauds and imposes the undertakings in the deed upon the grantee. Thus, in *Midland Railway v. Fisher*, (1890) 125 Ind. 19, 24 N.E. 756, the Indiana Supreme Court held that a covenant (to erect a fence) contained

in a deed accepted by the grantee satisfies the Statute of Frauds and ran with the land to bind subsequent grantees. *See* 2 American Law of Property § 9.9 at 365 (A. Casner ed. 1952). The rule applies to liens as well as to covenants generally. Another authority, 7 G. Thompson, Commentaries on the Modern Law of Real Property § 3157 at 93 (J. Grimes ed. 1962), says:

> Promises in deeds for the grantee to perform some act may be expressly or impliedly made a lien upon the land which is subject to foreclosure on breach and which binds the land through constructive notice even in the hands of innocent purchasers.

■ The members also argue that the quitclaim deed from Montgomery to Charles had the effect of extinguishing any requirement for them to belong to Brendonwood Common or contribute to the upkeep of the neighborhood. In this case the deed from Montgomery to Charles, as well as the recorded articles and bylaws of Brendonwood Common, demonstrate that a general improvement plan was intended for Brendonwood so that each lot owner and the corporation itself could sue any lot owner who failed to observe the covenants, stipulations, and agreements in the deed from Montgomery to Charles. The members took their properties with actual or record notice of their duty to belong to Brendonwood Common. When Charles conveyed the common properties to Brendonwood Common, his implementation of the general plan had begun. The subsequent quitclaim deed was ineffective to intervene or vitiate Charles' implementation of the plan. The trial court found that quitclaim deed did not extinguish the covenants. This finding is necessarily implicit in the court's decision that the members were required to pay the assessments owing Brendonwood Common prior to judgment. Only after the judgment declaring the conditions so radically changed to make it unfair and unreasonable for these members to remain a part of the corporation, did the court release them from the covenants. The trial court's implicit finding was correct.

B.

In addition to its error in abrogating the restrictions on members' lots, the trial court also erred in concluding both that they had effectively withdrawn from Brendonwood Common by mailing a letter to the corporation and that their supposed withdrawal terminated their duties to share in maintenance expenses. Brendonwood Common's articles of incorporation provide that memberships in the corporation are appurtenant to each of the 110 lots in Brendonwood and that memberships are transferable only to successive transferees of each lot. The requirements of the articles, then, are that a membership is transferable only by sale of the lot to which it is appurtenant and that a lot owner may avoid his membership in Brendonwood Common only by selling his property. Because it is expressed in the articles of incorporation, the requirement that a withdrawal of membership from the corporation may be accomplished only by a sale of the applicable lot constitutes a contract by the members. *See McCallister v. Shannondale Co-Operative Telephone Co.*, (1911) 47 Ind.App. 517, 94 N.E. 910, 913. In order to withdraw their memberships, the members were required by their contracts to sell their lots. The members have not sold their lots, and the trial court erred as a matter of law in concluding that anything short of a sale was sufficient to cut off their duty to pay their fees.

A similar case is *Rodruck v. Sand Point Maintenance Commission*, (1956) 48 Wash.2d 565, 295 P.2d 714, in which the court affirmed the enforcement of assessments levied by the Commission (a not-for-profit corporation) on an acreage basis against its members' lots. The court's description of the mechanics of the membership and assessment system would aptly describe the system used by Brendonwood Common:

The basic plan of operation of the commission is this. Each lot owner has one membership in the commission which is appurtenant to the land owned. A board of trustees elected by the members maintains and improves, among other things, the streets in the district, and levies assessments against the members for the cost of these improvements and maintenance work. Unpaid assessments become a lien on the property and are foreclosable against the individual lots as in the case of mortgages.

295 P.2d at 716. Recorded deeds to each of the delinquent members referred to the expense of maintaining the common areas and provided that:

[T]he cost thereof, including installation and maintenance of water, sewerage, gas, electric light and power and telephone, and such other service and service lines as may be deemed useful by said commission, [are] to be assessed by it to and paid by the owners of tracts in said residential district, *in the manner provided in the by-laws of said corporation.*

295 P.2d at 719. (Emphasis added.) Moreover, the assessment technique articulated in the bylaws was for assessment on an acreage basis—the same technique articulated in the bylaws of Brendonwood Common. After the corporation commenced litigation to recover delinquent assessments, as in this case, the defendants sought to withdraw their memberships in the corporation and also argue that the restrictions in their deeds did not run with the land. Following *Neponsit Property Owners Ass'n v. Emigrant Industrial Sav. Bank*, (1938) 278 N.Y. 248, 15 N.E.2d 793, the Washington Court first held that the restrictions were enforceable and ran with the land. Addressing the members' contention that they had withdrawn from the corporation, the court observed that the corporate bylaws constituted a contract between the defendants and the corporation. 295 P.2d at 722. It then said:

As to the issue of withdrawal of membership, appellants Burke seek to effect a withdrawal which would relieve their property, as well as themselves, of the responsibilities attached to membership in the commission.

. . . We will not interfere with the right of the commission to govern the incidents of membership therein.

The assessments now due and owing to the commission were levied in accordance with authority vested in that body. They are binding obligations as against appellants and the property to which they hold title in the Sand Point District.

295 P.2d at 723. The members' attempted withdrawals of membership in this case as equally ineffective as in *Sand Point.*

■ Further, the members' withdrawals were ineffective to avoid a contractually implied duty to share in Brendonwood Common's expenses on an acreage basis. That duty arises from each purchase of a lot with knowledge that acreage assessments were being levied upon it. *Harbor Hills Landowners v. Manelski,* (1970) 65 Misc.2d 682, 318 N.Y.S.2d 793; *see Sea Gate Association v. Fleischer,* (Sup.1960) 211 N.Y.S.2d 767 (where it was held that members' purchase of property upon notice of its restrictions constituted a contract between them and the corporation to pay for the corporation's services in the manner provided in its bylaws, irrespective of their membership in the corporation, for as long as they owned their properties.) The members here had the twin options to be members of the corporation and seek to influence its Board of Directors in making its budgetary decisions or, that failing, to sell their properties. Otherwise, they were subject to assessment on an acreage basis in the manner to which they had agreed.

### C.

■ The trial court concluded that amounts owing by the members to Brendonwood Common were liens upon the members' lots and that the liens should be foreclosed. The trial court did not order the members' properties foreclosed by the sheriff pursuant to those liens even though Brendonwood Common specifically requested such relief in its complaint. We agree with the trial court's conclusion on this matter and remand for proceedings consistent with that conclusion and this opinion.

### D.

■ As found by the trial court, Brendonwood Common's bylaws make its assessments liens upon the members' lots and provide for, at the election of Brendonwood Common, foreclosure "with interest, attorney's fees and costs." As already noted, Brendonwood Common's bylaws constitute a contract among it and the members. *See McCallister v. Shannondale Co-Operative Telephone Co., supra; Rudruck v. Sand Point Maintenance Commission, supra* ; and *Sea Gate Association v. Fleischer, supra.* That contract remains valid and enforceable. Even the trial court found the contract enforceable as to assessments made prior to the members' attempted withdrawal. "A contract that allows for the recovery of attorneys' fees will be enforced according to its terms if the contract is not contrary to law or public policy." *Honey Creek Corp. v. WNC Development Co.,* (1975) 165 Ind.App. 141, 331 N.E.2d 452, 459. Thus, the trial court was obliged to award attorney's fees.

The trial court's initial judgment awarded interest. However, its fourth and last modification, which altered the sums originally set forth in the initial judgment, makes no provision for interest. That is error. The trial court was obliged to award interest in accordance with the bylaws and the evidence.

The judgment of the trial court that such a change in conditions existed as to defeat the purpose of the covenants and that because of such conditions the members are no longer required to maintain their membership is reversed. We remand the case to the trial court for proceedings consistent with this opinion.

MILLER, P. J., and CHIPMAN, J., concur.