Stanley E. HOLLIDAY and Vera
M. Holliday, Appellants–
Defendants,

v.

CROOKED CREEK VILLAGES
HOMEOWNERS ASSOC., INC.,
Appellees–Plaintiffs.

No. 49A05–0010–CV–428.

Court of Appeals of Indiana.

Dec. 7, 2001.

Terry R. Curry, Butler, Schembs, Curry & Jones, Jeffrey O. Meunier, Kiefer & McGoff, Indianapolis, IN, Attorneys for Appellant.

William T. Rosenbaum, Maidena L. Fulford, Hyatt & Rosenbaum, P.A., Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Stanley and Vera Holliday ("the Hollidays") appeal the trial court's judgment against them and in favor of Crooked Creek Villages Homeowners Association, Inc. ("Crooked Creek"). They raise two issues on appeal, which we restate as:

I. Whether the evidence is sufficient to support the trial court's judgment against them; and

II. Whether the trial court erred in awarding attorney fees to Crooked Creek.

We affirm.

### Facts and Procedural History

The facts most favorable to the trial court's judgment reveal that Crooked Creek is a planned community of single-family residences located in Marion County and consists of 670 lots that are subject to plat covenants and restrictions. The plat and plat covenants for Crooked Creek were recorded in the Marion County Recorder's Office in May of 1994. The Hollidays purchased their residence in Crooked Creek on July 7, 1995.

As part of the construction of their home, the Hollidays had a satellite dish system installed that was capable of supplying Direct TV programming to televisions on the first and second floors of the home. The Hollidays eventually added a second satellite dish to supply programming to the basement television and a third dish for a television on their back porch. In addition, the Hollidays installed six masts behind their home, secured to the ground by guy wires. Five of the masts are approximately thirty feet tall, which is roughly even with the roofline of their home, and one mast is ten feet tall. Of the six masts, two function to provide

support to a third mast and the ten foot mast. Five television antennae and three satellite dish antennae have also been attached to the masts. The antennae's primary purpose is to provide over-the-air reception of local television channels for ten televisions, nine videocassette recorders (VCRs), and seven satellite receivers. The Hollidays also subscribe to Comcast Cablevision, which provides cable television programming to ten televisions in the house. In total, there are seventeen televisions and nine VCRs in the Holliday household.

In May of 1998, Crooked Creek notified the Hollidays by letter that the antennae and satellite dish system were in violation of paragraph eleven of the Crooked Creek plat covenant. Paragraph eleven provides generally that erection of any structure on a Crooked Creek lot, such as the lot owned by the Hollidays, is subject to prior approval by Crooked Creek's Architectural and Environmental Control Committee.

The Hollidays responded to Crooked Creek's notice with a letter stating that paragraph eleven of the plat covenant was in clear violation of Federal Communications Commission (FCC) rules and was thus unenforceable as written. Following one further notice from its attorney urging the Hollidays to comply with the plat covenant, Crooked Creek filed the instant cause of action on July 20, 1998. Crooked Creek's complaint requested: (1) a trial court determination that the Hollidays' antennae and satellite dish system are in violation of the plat covenant; (2) an injunction requiring the removal of the antennae and satellite dishes; and (3) costs and attorney fees.

In April of 1999, the Hollidays moved the trial court for a continuance of the trial date in order to petition the FCC for a declaratory ruling regarding the enforceability of the plat covenant under 47 C.F.R. § 1.4000.[1] The continuance was granted, and on October 8, 1999, the FCC issued its findings and order on the Hollidays' petition. The trial court subsequently conducted an evidentiary hearing to consider the effect of the FCC's findings and order. R. at 66.

On August 15, 2000, the trial court issued its findings of fact and judgment against the Hollidays and in favor of Crooked Creek. The trial court's order permitted the Hollidays "to maintain one mast attached to the side or back of their house which may support one satellite dish and one antenna." R. at 91. The trial court also awarded costs and attorney fees in the amount of $6000.00 to Crooked Creek. On September 13, 2000, Appellate Counsel entered his appearance on behalf of the Hollidays and filed a motion to correct error. The trial court issued an order denying the motion the following day.

The Hollidays appeal.

## I. Sufficiency of the Evidence

The Hollidays contend that the evidence is insufficient to support the trial court's judgment against them. Specifically, they argue that enforcement of paragraph eleven of the plat covenant is precluded by the declaratory ruling from the FCC in favor of the Hollidays. We disagree.

Our standard of review of sufficiency of the evidence is the same in civil cases as in criminal cases. *Gash v. Kohm,* 476 N.E.2d 910, 914 (Ind.Ct.App.1985). We consider only the evidence most favorable to the judgment and the reasonable inferences to be drawn therefrom. *Davis v. State,* 658 N.E.2d 896, 897 (Ind.1995).

---

1. The parties do not dispute the preemptive authority of the FCC ruling under the Supremacy Clause, Article VI, Section 2 of the U.S. Constitution.

We will not reweigh the evidence or judge the credibility of the witnesses. *Id.* The judgment will be affirmed unless we conclude that it is against the great weight of the evidence. *Gash,* 476 N.E.2d at 914.

■■■ The trial court entered findings of fact and conclusions of law pursuant to Trial Rule 52(A). In reviewing the judgment, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Crowley v. Crowley,* 708 N.E.2d 42, 54 (Ind.Ct.App.1999) (citing *Breeden v. Breeden,* 678 N.E.2d 423, 425 (Ind.Ct.App. 1997)). The judgment will be reversed only when clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks any supporting, probative evidence or reasonable inferences from such evidence to support them. *Id.*

The Crooked Creek plat covenant is a restrictive covenant. Paragraph eleven of the plat covenant provides in pertinent part:

> *ARCHITECTURAL DESIGN AND ENVIRONMENTAL CONTROL.* No building, fence, walls, or other structure shall be erected, placed, and altered on any building lot in this Subdivision until the building plans, specifications and plot plan showing the location of such structures have been approved as to the conformity and harmony of external design with existing structure herein and as to the building with respect to topography and finished ground elevations by an Architectural and Environmental Control Committee (Committee).

R. at 194. The Hollidays do not contend that the antennae and masts at issue are anything other than "structures" within the meaning of paragraph eleven.

■■■ A restrictive covenant is a contract between a grantor and a grantee, which restricts the grantee's use of land.

*Hrisomalos v. Smith,* 600 N.E.2d 1363, 1366 (Ind.Ct.App.1992). The general purpose of a restrictive covenant is to maintain or enhance the value of adjacent property by controlling the nature and use of surrounding properties. *Id.* Restrictive covenants are disfavored in the law. *Id.* However, because of their contractual nature, restrictive covenants are enforced as long as the restrictions are unambiguous and do not violate public policy. *Id.*

The Hollidays requested a declaratory ruling from the FCC regarding the enforceability of paragraph eleven of the plat covenant in light of 47 C.F.R. § 1.4000. The relevant portions of section 1.4000, also known as the FCC's Over–the–Air Reception Devices Rule ("Rule"), provide:

> (a)(1) Any restriction, including but not limited to any state or local law or regulation, including zoning, land-use, or building regulations, or any private covenant, contract provision, lease provision, homeowners' association rule or similar restriction, on property within the exclusive use or control of the antenna user where the user has a direct or indirect ownership or leasehold interest in the property that impairs the installation, maintenance, or use of:
>
> (i) An antenna that is:
>
> (A) Used to receive direct broadcast satellite service, including direct-to-home satellite service, or to receive or transmit fixed wireless signals via satellite, and
>
> (B) One meter or less in diameter or is located in Alaska;
>
> (ii) An antenna that is:
>
> (A) Used to receive video programming services via multipoint distribution services, including multichannel multipoint distribution services, instructional television fixed services, and local multipoint distribution services, or to receive

or transmit fixed wireless signals other than via satellite, and

 (B) That is one meter or less in diameter or diagonal measurement;
(iii) An antenna that is used to receive television broadcast signals; or
(iv) A mast supporting an antenna described in paragraphs (a)(1)(i), (a)(1)(ii), or (a)(1)(iii) of this section; is prohibited to the extent it so impairs, subject to paragraph (b) of this section.

47 C.F.R. § 1.4000(a)(1)(i)–(iv). The regulation further specifies that a restrictive entity "impairs installation, maintenance, or use of an antenna if it . . . [p]recludes reception or transmission of an acceptable quality signal." *Id.* at (a)(3)(iii). The regulation nevertheless permits otherwise prohibited restrictions if they are "necessary to accomplish a clearly defined, legitimate safety objective" or if they are "necessary to preserve a prehistoric or historic district, site, building, structure." *Id.* at (b)(1)–(2). The burden of proving that a restriction complies with the Rule falls upon the party seeking to impose or maintain the restriction. *Id.* at (g).

▮▮▮ In analyzing the enforceability of paragraph eleven within the context of the Rule, the FCC determined that it is "prohibited and unenforceable *to the extent* that it impairs the installation, maintenance, or use of over-the-air reception antennas" protected by the Rule. R. at 66 (emphasis added). More specifically, the FCC found that:

[Crooked Creek] has clearly stated a policy of limiting homeowners to the installation of one satellite dish antenna and one television antenna. We note that [Crooked Creek's] absolute limit appears to be based solely on aesthetic concerns and not on a valid safety basis. In the absence of a valid safety justification, an arbitrary limit can impair use of video antennas in violation of the Rule if a viewer needs more than the number of antennas allowed by [Crooked Creek] in order to receive an acceptable quality signal. Consequently, an Association or other restricting entity cannot impose an arbitrary limit on the number of antennas a viewer may install *provided they are necessary to receive the video programming available for reception in the viewer's viewing area. A restricting entity may prohibit the installation of equipment that is merely duplicative and not necessary for the reception of video programming.* However, the record in this proceeding does not contain sufficient information to enable us to determine whether it is necessary for [the Hollidays] to maintain five television antennas and three satellite dish antennas in order to receive the video programming available in their viewing area.

R. at 65–66 (emphasis added). Thus, the residual issue to be determined by the trial court was whether all of the Hollidays' satellite dishes, masts and antennae were necessary to ensure an acceptable quality signal on televisions in the Hollidays' home and not merely duplicative. It is clear from the Hollidays' FCC ruling and from other FCC rulings regarding restrictive covenants that the amount of reception equipment necessary to provide an acceptable quality signal for all of the television programming desired by a viewer is an issue to be decided on a case-by-case basis.[2]

---

**2.** Our review of published FCC decisions indicates that the precise question of whether the Over-the-Air Reception Devices Rule countenances an infinite number of antennae in order to support the reception of an acceptable quality signal to an unlimited number of televisions at a residence has never been considered by the FCC. Under the facts and

The Hollidays contend that Crooked Creek presented no evidence to the trial court tending to demonstrate that any of the satellite dishes, masts and antennae were duplicative and therefore subject to the paragraph eleven restriction. They argue that the undisputed evidence shows that Stanley Holliday carefully designed the satellite dish and antenna system to minimize the amount of equipment necessary to obtain an acceptable quality signal "to all of the television sets throughout his home." Br. of Appellant at 10.

However, under direct examination by Crooked Creek at the hearing, Stanley Holliday admitted without hesitation that he received all of the television programming he wished to receive on the television in his master bedroom, which is one of at least ten on the first and second floors of his home:

Q. Now, is there more than one (1) television set in your master bedroom?

A. Not at this time.

Q. Okay, so there's a single set?

A. Just a single set. I have two (2) VCRs though.

Q. Okay. And, um—is this television set connected to Direct TV?

A. Yes.

Q. And Comcast?

A. Yes.

Q. And—

A. And also off the air.

Q. Okay, and the combination of those three in your master bedroom, does that provide you with all the television programming that you wish to receive?

A. At this time, yes.

R. at 24–25.

The relevant portions of the trial court's findings are as follows:

circumstances presented to us in the record,

3. As a part of the construction of this home, Mr. and Mrs. Holliday had a satellite dish system installed by the builder which was designed so that one satellite dish could feed the first and second floor of the house.

4. Mr. and Mrs. Holliday added a second satellite dish to serve the television in the basement and a third satellite dish to serve the television on the back porch.

5. Mr. and Mrs. Holliday have three masts attached to their home and one satellite dish is attached to each mast.

6. Each mast also holds one or more antenna, which are used for reception of local stations.

7. The mast which supports the satellite dish for the television set on the back porch also requires the support of two poles which are installed in the Holliday's back yard.

8. Mr. and Mrs. Holliday have also chosen to subscribe to Comcast Cablevision, which is connected to ten (10) television sets throughout their home.

9. Federal law guarantees a homeowner the right to an acceptable quality signal to receive all television programming which they wish to receive.

10. Mr. and Mrs. Holliday can receive an acceptable quality signal of all television programming which they wish to receive on one or more television sets using a single satellite dish and a single television antenna. The additional satellite dishes, antenna, masts, poles and wires are merely duplicative and may be regulated or excluded by the Crooked Creek Villages Homeowners Association.

R. at 89–90.

We believe that the trial court's findings are dispositive. The evidence shows that we need not reach that question here.

the Hollidays can receive the programming they desire by retaining the original satellite dish system that services most of the televisions on the first and second floors of the home. Moreover, Stanley Holliday himself admitted that at least the television in the master bedroom currently receives all of the programming he desires. Under these circumstances, and without clearer guidance from the FCC, there is ample evidence that the antennae beyond those authorized by the trial court are "merely duplicative" and therefore subject to the prohibition of the restrictive covenant. We find that the evidence clearly supports the trial court's findings, which, in turn, support the judgment. To hold otherwise would cause paragraph eleven to be meaningless as it pertains to antennae and satellite dishes, a holding that Indiana common law requires us to strive to avoid. See, e.g., *Bicknell Minerals, Inc. v. Tilly,* 570 N.E.2d 1307, 1316 (Ind.Ct.App.1991), *trans. denied.*

## II. Attorney Fees

The Hollidays contend that the bulk of the $6000.00 awarded to Crooked Creek for attorney fees was incurred in connection with the declaratory ruling by the FCC. They argue that the trial court erred in granting the judgment for attorney fees in favor of Crooked Creek for any time spent responding to the Hollidays' petition to the FCC for declaratory judgment. The Hollidays assert that fees incurred due to the FCC matter are unrelated to those incurred as a result of the underlying claim to enforce the plat covenant and should therefore be excluded from the $6000.00 award of attorney fees.

▉▉▉ In Indiana, litigants are generally obligated to pay their own attorney fees in the absence of a statute, agreement, or stipulation authorizing such an award. *Scott v. Randle,* 736 N.E.2d 308, 312 (Ind.Ct.App.2000). Accordingly, a

contract allowing for recovery of attorney fees is enforceable, if the contract is not contrary to law or public policy. *Brendonwood Common v. Franklin,* 403 N.E.2d 1136, 1143 (Ind.Ct.App.1980). The amount recoverable for an award of attorney fees is left to the sound discretion of the trial court. *Castlewood Property Owners Ass'n v. Trepton,* 720 N.E.2d 10, 14 (Ind.Ct.App. 1999), *trans. denied.* An award of attorney fees will be reversed only for an abuse of discretion. *Id.* The trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before it. *Id.* The amount of the trial court's award of attorney fees must be supported by the evidence. *Id.*

▉▉▉ Paragraph twenty-two of the Crooked Creek plat covenant provides for attorney fees as follows:

*ENFORCEMENT.* Violation or threatened violation of these covenants and restrictions shall be grounds for an action by Developer, any person or entity having any right, title or interest in the Real Estate (or any part thereof), or any person or entity having any right, title or interest in a lot in the Subdivision and all persons or entities claiming under them, against the person or entity violating or threatening to violate any such covenants or restrictions. *Available relief in any such action shall include recovery of damages or other sums due for such violation, injunctive relief against any such violation or threatened violation, declaratory relief, and the recovery of costs and attorneys' fees incurred by any party successfully enforcing these covenants and restrictions;* provided, however, that the Developer shall not be liable for damages of any kind to any person for failing to enforce or carry out such covenants or restrictions.

R. at 196 (emphasis added). Recovery of attorney fees incurred as a result of

Crooked Creek's response to the Hollidays' petition to the FCC for declaratory judgment is clearly authorized in this provision. In addition, Crooked Creek specifically requested attorney fees in its complaint. The trial court did not abuse its discretion in its award of attorney fees to Crooked Creek.

 Further, we find the amount of the award to have a sound basis in the record even though the exhibit on which it is based was not included. Crooked Creek's Counsel represented to the trial court that he spent seven and a half hours on the case in 1998 when his hourly rate was $110, for a total of $825. In 1999, his hourly rate increased to $125 and remained such for the pendency of the case. Through noon of the hearing date, Counsel represented that he billed thirty-eight point three hours, for a total of $4787.50. At the time of his testimony regarding fees, Counsel represented that he had worked an additional two hours and forty minutes, which works out to approximately $337.50. Therefore, Crooked Creek's total accrued attorney fees at the end of their case-in-chief was $5950.00. We find that the record supports the trial court's award of $6000.00 in attorney fees to Crooked Creek.

## Conclusion

The evidence supports the trial court's judgment in favor of Crooked Creek, as well as the amount of attorney fees awarded in Crooked Creek's favor pursuant to paragraph twenty-two of the plat covenant.

Affirmed.

BAILEY, J., and SULLIVAN, J., concur.