

FILED

Jan 19 2024, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT
EDGEROCK DEVELOPMENT, LLC

Maggie L. Smith
Darren A. Craig
Frost Brown Todd LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT ZPS
WESTFIELD, LLC

Nathaniel M. Uhl
Jenny R. Buchheit
Adam M. Alexander
Ice Miller LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT FIRST
BANK RICHMOND

Scott J. Fandre
David M. Johnson
Krieg DeVault LLP
Mishawaka, Indiana

James E. Carlberg
Nathan T. Danielson
Bose McKinney & Evans LLP
Indianapolis Indiana

Ronald L. Cross
Boston Bever Forrest Cross & Sicmann
Richmond, Indiana

ATTORNEYS FOR *AMICUS CURIAE*
INDIANA BANKERS ASSOCIATION IN
SUPPORT OF APPELLANT FIRST BANK
RICHMOND

ATTORNEYS FOR APPELLEES C.H.
GARMONG & SON, INC., AND
SIGNWORKS, INC.

Peter S. French
Jeffrey D. Stemerick
Neil R. Peluchette
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
FOX CONTRACTORS CORP.

Robert W. Eherenman
Melanie L. Farr
Haller Colvin PC
Fort Wayne, Indiana

ATTORNEYS FOR *AMICI
CURIAE* INDIANA
CONSTRUCTORS, INC.,
INDIANA BUILDERS
ASSOCIATION, AND
ASSOCIATED GENERAL
CONTRACTORS OF INDIANA,
INC., IN SUPPORT OF
APPELLEES

Joseph M. Leone
Michael F. Drewry
Sean T. Devenney
Drewry Simmons Vornehm, LLP
Carmel, Indiana

Thomas W. Dinwiddie
Daniel R. Kelley
Dinsmore & Shohl LLP
Indianapolis, Indiana

I N   T H E
# COURT OF APPEALS OF INDIANA

EdgeRock Development, LLC;
ZPS Westfield, LLC; First Bank
Richmond,

*Appellants/Cross-Appeal
Appellees/Defendants/Counterclaim
Plaintiffs),*

v.

C.H. Garmong & Son, Inc. and
Signworks, Inc.; and Fox
Contractors Corp.,

*Appellees/Plaintiffs/Counterclaim
Defendants,*

and

Fox Contractors Corp.,

*Appellee/Cross-Appeal
Appellant/Plaintiff/Counterclaim
Defendant.*

January 19, 2024

Court of Appeals Cause No.
22A-PL-1968

Appeal from the Hamilton
Superior Court

The Honorable David K. Najjar,
Judge

Trial Court Cause No.
29D05-1912-PL-11500

Consolidated with Court of
Appeals Cause No. 22A-PL-1993

**Opinion by Judge Bradford**
Judges Riley and Weissmann concur.

**Bradford, Judge.**

# Case Summary

[1] EdgeRock Development LLC ("EdgeRock") contracted with C.H. Garmong & Son, Inc. ("Garmong"), Fox Contractors Corp. ("Fox"), and Signworks ("Signworks") to complete the "Trails of Westfield" (the "Project"), a commercial building project along State Road 32 in the City of Westfield (the "City"). The Project included work that was to be completed on five different parcels of land, which were owned by three different entities. EdgeRock owned two of the parcels, which were secured by a mortgage that had been executed in favor of First Bank Richmond ("First Bank"). ZPS Westfield, LLC ("ZPS") owned two of the parcels and contracted directly with EdgeRock for the work that was to be completed on its land in connection with the Project and paid its financial obligations outlined in its contract with EdgeRock in full.

[2] EdgeRock, however, failed to satisfy its financial obligations under its contracts with Garmong, Fox, and Signworks, all three of which sought to encumber certain parcels connected with the Project with mechanic's liens and filed breach-of-contract actions against EdgeRock. After finding, *inter alia*, that the mechanic's liens filed in connection with the Project were valid and had priority over a portion of First Bank's mortgage interest in EdgeRock's property, the trial court entered judgment against EdgeRock and *in rem* judgments against EdgeRock's and ZPS's property. The trial court also determined that EdgeRock was entitled to recover certain road-impact fees (the "RIF Funds") that had been paid in connection to the Project by the City.

[3]     ZPS and EdgeRock challenge the trial court's determinations regarding the validity of Garmong's and Fox's mechanic's liens. ZPS also challenges the inclusion of uninstalled material in Signworks's mechanic's lien against its property as well as the propriety of the prejudgment interest awarded to Signworks. First Bank challenges the trial court's determination that the mechanic's liens had priority over part of its recorded mortgage interest. EdgeRock challenges various summary judgment rulings made by the trial court, and multiple parties challenge the trial court's determination that EdgeRock is entitled to receive the RIF Funds.

[4]     We conclude that (1) both Garmong's and Fox's mechanic's liens against ZPS's and EdgeRock's property are invalid; (2) the cost of uninstalled material should not have been in included in Signworks's mechanic's lien on ZPS's property and ZPS should not have been ordered to pay prejudgment interest to Signworks; (3) to the extent that priority questions remain, First Bank's mortgage interest, in its entirety, has priority; (4) the trial court did not err in making the challenged summary judgment rulings; and (5) distribution of the RIF Funds is stayed pending a ruling by the Hamilton Commercial Court in a related matter regarding the priority of the secured interests in the funds and any future ruling from this court regarding the RIF Funds should be consistent with that of the Hamilton Commercial Court. We further conclude that the trial court erred in denying First Bank's request for attorney's fees but that no party is entitled to an award of appellate attorney's fees. In addition, we note that EdgeRock has not challenged the judgments against it relating to the

breach-of-contract claims brought by Garmong, Fox, and Signworks, and our conclusions relating to the validity of the mechanic's liens do not alter those judgments against EdgeRock in any way. Pursuant to our above-stated conclusions, we therefore affirm the judgment of the trial court in part, reverse in part, and remand with instructions.

# Facts and Procedural History

## I. Initiation of the Project

In 2015, EdgeRock and its investors purchased numerous separate parcels of undeveloped land totaling seventeen acres along State Road 32 in the City. The parcels were subsequently divided into Lots 1 through 5 as depicted below:



Appellants' Jt. App. Vol. 5 p. 82. The five lots were then zoned as follows:

- Lot 1 was zoned for retail business (and would eventually become a Starbucks);
- Lot 2 was zoned for retail business (and would eventually become a Penn Station and Forum Credit Union);
- Lot 3 was zoned for retail business (and would eventually become a Crew Carwash);
- Lot 4 was zoned for multi-family apartments; and
- Lot 5 was zoned for retail business.

EdgeRock sold Lots 1 and 2 to ZPS in 2017, and, at some point, sold Lot 3 to Dahm No. 49, LLC ("Dahm").[1] EdgeRock maintained ownership of Lots 4 and 5.

[6] After purchasing Lots 1 and 2, ZPS contracted with EdgeRock to build two structures and install related infrastructure on its property. ZPS's development agreement for the construction and infrastructure on its property called for ZPS to pay EdgeRock a total of $1,720,000.00. It is undisputed that ZPS paid the entire amount it owed to EdgeRock, making its final payment in August of 2018.

[7] EdgeRock then contracted with Garmong to perform not only the work on ZPS's property, but also work on the properties owned by EdgeRock and Dahm. The total EdgeRock-Garmong contract amount was $3,253,390.00. The EdgeRock-Garmong contract broke down the cost of Garmong's work into two categories: "Lots 1 & 2" totaling $1,172,114.00 and "Infrastructure" totaling $1,730,284.00. Appellants' Jt. App. Vol. 2 p. 240. The contract also

---

[1] Dahm was not a party to the underlying litigation and does not participate in this appeal.

included $110,000.00 in contingency funds and an eight percent management fee ($240,992.00) payable to Garmong. Garmong later submitted several change orders, including Change Order 3 in the amount of $434,528.00, which included work on Lot 3. ZPS was not a party to the EdgeRock-Garmong contract. Fox had a subcontract with Garmong, which included work on all five lots.

[8] As part of the Project, the City contracted with EdgeRock to build 175th Street (which would run to the north of Lots 4 and 5 and to the south of Lots 1, 2, and 3) and install related infrastructure (the "175th-Street Project"). The 175th-Street Project was to be funded, at least in part, by RIF Funds issued by the City. The 175th-Street Project included "17.6 acres," with ZPS's property making up 10.2% of the total acreage of the project and EdgeRock's property making up 58.6% of the total acreage. Appellants' Jt. App. Vol. 9 p. 36. The remaining acreage came from Dahm's property. EdgeRock contracted directly with Fox to complete the 175th-Street Project, which included building 175th Street and installing related infrastructure. The EdgeRock-Fox contract was for a total of $1,831,008.25. ZPS was not a party to the EdgeRock-Fox contract. Its sole involvement was quitclaiming certain land needed to construct 175th Street to the City.

[9] In September of 2018, EdgeRock contracted with Signworks to install two signs on ZPS's property for a total price of $115,521.33. ZPS was not a party to the EdgeRock-Signworks contract.

## II.  Issues with Payment/Garmong's First Mechanic's Lien

As the Project moved forward, EdgeRock's payments to Garmong became somewhat sporadic.  EdgeRock paid invoices that had been submitted by Garmong on December 11, 2017, April 17, 2018, and June 1, 2018.  EdgeRock did not pay invoices that were submitted by Garmong on March 7, 2018, June 20, 2018, July 30, 2018, August 24, 2018, September 25, 2018, and October 30, 2018.  On December 4, 2018, following five months of nonpayment from EdgeRock, Garmong filed a notice of intention to hold a mechanic's lien, and recorded a mechanic's lien in the amount of $2,140,722.51.  The lien was recorded on December 5, 2018 (the "2018 Garmong Lien").

## III.  First Bank Mortgage

During late 2018 or early 2019, EdgeRock sought financing from First Bank "to refinance the existing mortgages" on the planned development "and pay for the construction work" that had thus far been completed.  Ultimately, EdgeRock received a $4,900,000.00 commercial loan from First Bank "to reimburse for land development expense[s] and payoff existing mortgages on Lots 4 and 5."  Ex. Vol. 19 p. 125.  In return, First Bank received a mortgage interest on Lots 4 and 5 (the "First Bank Mortgage"); an assignment of EdgeRock's interests in an agreement with Citizens Wastewater of Westfield, LLC; a secured interest in the RIF Funds; and guaranty from EdgeRock's executives, Austin Dalton and R. Birch Dalton.  First Bank's loan documents included:  (1) a UCC financing statement signed by EdgeRock, granting the Bank a security interest in the RIF

Funds; (2) a Security Agreement executed by EdgeRock, granting First Bank a security interest in the RIF Funds; and (3) a UCC financing statement filed with the Indiana Secretary of State, covering collateral including the RIF Funds.

[12] The First Bank Mortgage was duly recorded on February 25, 2019. It is undisputed that proceeds from the loan were distributed as follows:

| Amount | Purpose |
| --- | --- |
| $2,140,722.51 | Payment to secure release of the 2018 Garmong Lien |
| $250,000.00 | Payment of Blocked Interest Account Funds (used for payment of loan interest) |
| $45,431.00 | Payment of loan origination fee |
| $3500.00 | Payment of appraisal fee |
| $1000.00 | Payment of appraisal review fee |
| $46.00 | Payment of fee for flood determination |
| $23.00 | Payment of wire and UCC filing fees |
| $9269.00 | Payment of various title company charges |
| $165.00 | Payment of recording charges |
| $2,028,443.62 | Payment to Acquisition Lenders to secure release of the Acquisition Mortgage |
| $15,000.00 | Payment of EdgeRock's legal fees |
| $5000.00 | Payment of insurance premium |
| $401,399.87 | Payment to EdgeRock |

The amounts tendered to the Acquisition Lenders equaled the amounts remaining due under their respective acquisition promissory notes and served to secure release of the Acquisition Mortgage. Following Garmong's receipt of the $2,140,722.51, the 2018 Garmong Lien was released.

[13] A condition of the First Bank Mortgage had been that First Bank would "receive a first priority mortgage on Lots 4 and 5." Tr. Vol. 6 p. 117. First

Bank had not been made aware prior to the closing of the First Bank Mortgage that Garmong "had an outstanding claim for work performed of over $1 million in addition to the Garmong mechanic's lien of $2.1 million that was being paid off at the closing." Tr. Vol. 6 p. 117.

## IV. Continued Issues with Payment

[14] Garmong submitted an invoice to EdgeRock on November 19, 2018, in the amount of $299,155.84. This invoice had not been included in the 2018 Garmong Lien because the due date for payment had not passed as of the date that the lien had been recorded. EdgeRock did not pay this invoice. Garmong submitted another invoice to EdgeRock in the amount of $643,886.80 on January 23, 2019. EdgeRock did not pay this invoice.

[15] According to the terms of its subcontract with Garmong, Fox was to receive $1,315,000.00. According to the terms of its direct contract with EdgeRock, Fox was to receive $1,831,008.25. Fox was not paid in full for its work done under either contract.

[16] Signworks submitted invoices to EdgeRock on November 29, 2018, January 28, 2019, and April 17, 2019. EdgeRock, however, did not make any payments to Signworks outside of its initial $3000.00 deposit.

## V. The Mechanic's Liens

[17] On June 24, 2019, Signworks recorded a mechanic's lien against Lot 1 in the amount of $48,992.29 and a separate mechanic's lien against Lot 2 in the

amount of $59,039.04. On August 30, 2019, Fox recorded mechanic's liens—each in the sum of $1,213,228.23—against ZPS's Lots 1 and 2 and EdgeRock's Lots 4 and 5. On September 4, 2019, Garmong recorded mechanic's liens against Lots 4 and 5 in the amount of $1,009,055.62. The next day, Garmong recorded mechanic's liens against Lots 1 and 2 in the same amount. On September 10, 2019, Fox recorded additional mechanic's liens against Lots 1, 2, 4, and 5, each in the amount of $500,053.43. Litigation under cause number 29D05-1912-PL-11500 ("Cause No. PL-11500") soon followed.

## VI.  Lien Foreclosure Proceedings

[18] On December 9, 2019, Garmong filed suit under Cause No. PL-11500 against EdgeRock, ZPS, First Bank, Fox, and Signworks, seeking to foreclose its mechanic's liens and alleging breach of contract, unjust enrichment, and damages. On March 4, 2020, Fox filed cross-claims against EdgeRock and ZPS, seeking to foreclose its mechanic's liens and alleging breach of contract, unjust enrichment, and violation of personal liability notice. On March 10, 2020, Fox filed a third-party complaint against the City in which it indicated that it had named the City "as a party to assert any interest it may have in the Edge[R]ock Property and/or ZPS property." Appellants' Jt. App. Vol. 3 pp. 152, 153. On May 29, 2020, Garmong requested leave to amend its complaint to dismiss its claims against Signworks and to add Signworks as a plaintiff to its complaint. The trial court granted Garmong's motion and Garmong filed an amended complaint listing Signworks as a plaintiff rather than a defendant.

Counterclaims were subsequently filed against Garmong by EdgeRock and Fox. The trial court scheduled trial starting on January 21, 2021.

## VII. The RIF Funds

[19] On February 19, 2021, the City filed a motion for interpleader, in which it sought "an order requiring the deposit of funds with the Court, declaring that [the City] has satisfied its obligation under the [RIF] Credit Agreement, and that its property is not encumbered by any parties to this matter, and ordering its dismissal with prejudice." Appellants' Jt. App. Vol. 16 p. 12. The City claimed that it "is in no position to determine how much should be disbursed to each party that completed work on 175th." Appellants' Jt. App. Vol. 16 p. 15. Fox responded claiming that it "is the only party in this lawsuit which performed any work and supplied any materials for the construction of 175th Street and the relocation of the Anna Kendall Drain [(the "Drain")]. Fox is entitled to all of the funds that will be interpleaded by [the City]." Appellants' Jt. App. Vol. 16 p. 28. First Bank also claimed to be entitled to the RIF Funds. While ZPS did not assert a formal claim for the RIF Funds in Cause No. PL-11500, it asserted a priority interest in the RIF Funds in a separately filed lawsuit in the Hamilton Commercial Court, under cause number 29D02-2107-PL-5088 ("Cause No. PL-5088"). This lawsuit, which was filed on July 20, 2021, remains pending.[2]

---

[2] The proceedings in the commercial court action were stayed by order of the court on June 21, 2022.

## VIII.    Competing Motions for Partial Summary Judgment

On May 7, 2020, EdgeRock filed a motion for partial summary judgment. On December 7, 2020, ZPS filed a motion for partial summary judgment. Ten days later, the trial court issued an order holding all motions for summary judgment in abeyance until trial began on January 21, 2021.

On January 28, 2021, following the first two days of trial, the trial court issued an order informing the parties that it would "consider summary judgment motions prior to the next hearing date on April 9, 2021." Appellants' Jt. App. Vol. 16 p. 77. The trial court further ordered that

> The parties are given until February 12, 2021[,] to file any new or amended motions for summary judgment. The parties shall be given until March 15, 2021[,] to file any responses to summary judgment motions. A hearing will be set for the Court to hear arguments on all summary judgment motions on March 24, 2021[.]

Appellants' Jt. App. Vol. 16 p. 77. Signworks, Fox, and Garmong moved for partial summary judgment on February 12, 2021. Also on February 12, 2021, ZPS and EdgeRock filed amended motions for partial summary judgment.

## IX.  The Trial Court's Orders

On April 7, 2021, the trial court issued an order granting Garmong's motion for partial summary judgment and denying EdgeRock's motion for partial summary judgment. In this order, the trial court found that Garmong's

mechanic's liens against EdgeRock's property were valid and that summary judgment relating to Change Order 3 was improper because a material dispute remained as to whether Change Order 3 had been approved by EdgeRock. The trial court further found that the 175th-Street Project and the relocation of the Drain were never part of the EdgeRock-Garmong contract; the consequential damages waiver barred EdgeRock's claim for rent abatement, loss of future business, and tortious interference with banking relationships; EdgeRock's tortious interference claims are barred by the waiver; and rent abatement paid to ZPS is barred by the waiver.

[23] On April 28, 2021, the trial court issued an order granting in part and denying in part ZPS's motion for partial summary judgment. In this order, the trial court found that ZPS was entitled to summary judgment on the unjust enrichment claims brought by Garmong and Signworks. The trial court found that summary judgment relating to the validity of Garmong's and Fox's mechanic's liens filed against ZPS's property was improper because issues of material fact remained as to whether the liens were valid, specifically whether the liens were overstated. In denying summary judgment on the question of whether the mechanic's liens were valid, the trial court found, as a matter of law, that Fox's mechanic's lien had been timely filed. The trial court further found that ZPS was entitled to summary judgment on Garmong's, Signworks's, and Fox's requests for attorney's fees, stating that it is undisputed that ZPS had paid EdgeRock "all that it was obligated to pay under the terms of the

Development Agreement," and, as a result, "Garmong, Signworks, and Fox may not recover attorney's fees" from ZPS. Appellants' Jt. App. Vol. 2 p. 83.

[24] On May 12, 2021, the trial court issued an order granting in part and denying in part Fox's motion for partial summary judgment. In this order, the trial court found, as a matter of law, that Fox's liens on EdgeRock's property were valid, but found that issues of material fact existed as to the validity of Fox's liens on ZPS's property.

[25] Also on May 12, 2021, the trial court issued an order granting Signworks's motion for partial summary judgment. In this order, the trial court found that Signworks's mechanic's liens against ZPS's property were "valid as a matter of law." Appellants' Jt. App. Vol. 2 p. 100.

[26] Trial continued on all remaining issues. After the conclusion of trial, on May 25, 2022, the trial court entered its findings of fact, conclusions of law, and judgment. With respect to Garmong's claims against EdgeRock and ZPS, the trial court concluded as follows: (1) EdgeRock had breached its contract with Garmong; (2) Garmong was entitled to foreclose its liens on EdgeRock's property; (3) Garmong's liens on ZPS's property were valid and were not overstated; (4) Garmong had not breached its contract with EdgeRock; (5) there was no basis for EdgeRock's slander-of-title or fraud claims; and (6) there was no basis for ZPS's slander-of-title claims.

[27] With respect to Fox's claims against EdgeRock and ZPS, the trial court concluded that EdgeRock had breached its contract with Fox. The trial court

further concluded that Fox's mechanic's liens against both EdgeRock's property and ZPS's property were valid and that Fox was entitled to foreclose its liens.

[28] With respect to Signworks's claims, the trial court concluded that EdgeRock had breached its contract with Signworks. As a result of the breach, Signworks was entitled to recover attorney's fees from EdgeRock.

[29] With respect to questions relating to lien priority, the trial court concluded as follows: (1) First Bank only had priority for the first $2,140,722.51 of its loan to EdgeRock; (2) mechanic's liens take priority from the date the contractor begins work; (3) equitable subrogation is not compatible with the Indiana Mechanic's Lien Statute (the "IMLS") and does not apply; (4) even if equitable subrogation could apply, the equities favor Garmong and Fox; (5) First Bank's equitable estoppel argument fails; (6) the "specific project" language of Indiana Code section 32-28-3-5(d) did not encompass First Bank's entire loan; and (7) First Bank was entitled to the RIF Funds.

[30] Based on these conclusions, the trial court ordered the following:

> 1. Judgment is entered in favor of Garmong and against [EdgeRock] on Count 3 of Garmong's Amended Complaint in the amount of $943,042.64, plus interest on the balance at the rate of at 12% per year accruing from February 23, 2019 (the due date of the final invoice). The interest accrued through May 25, 2022 is $367,709.12, making the total judgment on Count 3 of Garmong's Amended Complaint as of today's date $1,310,751.76, plus court costs.

> 2. Judgment *in rem* is entered in favor of Garmong on Count

1 of Garmong's Amended Complaint against [EdgeRock's] Lots 4 and 5 in the amount of $943,042.64, plus interest on the balance at the rate of at 12% per year accruing from February 23, 2019 (the due date of the final invoice), plus Garmong's reasonable attorney's fees. The interest accrued through May 25, 2022 is $367,709.12, making the total *in rem* judgment on Count 1 of Garmong's Amended Complaint against [EdgeRock's] Lots 4 and 5 as of today's date $1,310,751.76, plus Garmong's reasonable attorney's fees and court costs.

3. Judgment *in rem* is entered for Garmong on Count 2 of Garmong's Amended Complaint against ZPS's Lots 1 and 2 in the amount of $943,042.64[,] plus interest on the balance at the rate of at 12% per year accruing from February 23, 2019 (the due date of the final invoice). The interest accrued through May 25, 2022 is $367,709.12 making the total judgment as of today's date $1,310,751.76, plus court costs.

4. Judgment is entered in favor of Signworks and against [EdgeRock] on Count 6 of Signworks'[s] Amended Complaint in the amount of $93,268.37, plus interest on the balance at the rate of 1.75% per month from April 30, 2019 (the due date of the final invoice), plus reasonable attorney's fees. The interest accrued through May 25, 2022 is $60,100.60, making the total judgment on Count 6 of Signworks'[s] Amended Complaint as of today's date $153,368.97, plus attorney's fees and court costs.

5. Judgment *in rem* is entered in favor of Signworks on Count 5 of Signworks'[s] Amended Complaint against ZPS's Lots 1 and 2 in the amount of $93,268.37, plus interest on the balance at the rate of 1.75% per month from April 30, 2019 (the due date of the final invoice). The interest accrued through May 25, 2022 is $60,100.60 making the total *in rem* judgment on Count 5 of Signworks' Amended Complaint against ZPS's Lots 1 and 2 as of today's date $153,368.97 plus court costs.

6. Judgment is entered in favor of [Fox] on its crossclaim

against [EdgeRock] on breach of contract in the amount of $1,301,531.37, plus court costs.

7.      Judgment *in rem* is entered in favor of [Fox] on its cross-claim against the [EdgeRock] Real Estate in the amount of:  (a) $202,623.56 (the amount due under the Garmong Subcontract); and (b) $1,166,728.23 (the amount of due under the [EdgeRock] Contract), plus court costs and attorney's fees.

8.      Judgment *in rem* is entered in favor of [Fox] on its cross-claim against the ZPS Real Estate in the amount of (a) $202,623.56 (the amount due under the Garmong Subcontract); and (b) $1,166,728.23 (the amount of due under the [EdgeRock] Contract), plus court costs.…

10.     Judgment is entered in favor of Garmong and against [EdgeRock] and ZPS on all remaining counterclaims.

11.     Judgment is entered in favor of Fox and against [EdgeRock] on all remaining cross-claims.

12.     Garmong's mechanic's lien on Lots 4 and 5 is foreclosed.

13.     Garmong's mechanic's lien on Lots 1 and 2 is foreclosed.…

16.     Signworks'[s] mechanic's liens are foreclosed.

17.     Judgment is entered for Signworks and against [EdgeRock] and ZPS on all remaining counterclaims.

Appellants' Jt. App. Vol. 2 pp. 178–80.

[31]    On July 20, 2022, the trial court issued four additional orders in which it granted Garmong's, Fox's, and Signworks's requests that EdgeRock pay their

attorneys' fees and denied First Bank's request for the same. On September 28, 2022, the trial court issued an order staying the sale of ZPS's property and ruling on pending motions to correct error. The trial court ordered that EdgeRock's property "be sold first, with no priority for attorney's fees." Appellants' Jt. App. Vol. 2 p. 184. The trial court further ordered that "the first $202,623.56 collected by Garmong be conveyed to Fox"; the award of prejudgment interest was appropriately calculated; the RIF Funds should be paid to EdgeRock; and "[a]ny sums collected by Garmong, Fox, and/or Signworks from [EdgeRock], or as a result of the sale of the [EdgeRock] real estate, shall correspondingly reduce the applicable judgment amounts against the ZPS Real Estate." Appellants' Jt. App. Vol. 2 pp. 184, 188. The trial court also denied First Bank's motion to correct error regarding its determination that only a portion of its mortgage interest should have senior priority and ordered that disbursement of the RIF Funds would be stayed pending the completion of the appellate process.

# Discussion and Decision

## I. Brief Overview of the IMLS

[32] "A mechanic's lien is a statutory tool to help collect payment for labor and materials that improve real property." *Serv. Steel Warehouse Co., L.P. v. U.S. Steel Corp.*, 182 N.E.3d 840, 842–43 (Ind. 2022) (citing *Premier Invs. v. Suites of Am., Inc.*, 644 N.E.2d 124, 130 (Ind. 1994)).

The historical origin and purpose of mechanic's lien statutes was to make a property owner an involuntary guarantor of payments for the reasonable value of improvements made to real estate by the physical labor or materials furnished by laborers or materialmen. Thus, the purpose of mechanic's lien laws is to prevent the inequity of a property owner enjoying the benefits of the labor and materials furnished by others without recompense.

*Premier Invs.*, 644 N.E.2d at 130 (internal citation omitted). Stated differently, a mechanic's lien "prevents landowners from enjoying their improved property while those who provided the labor and materials get the shaft." *U.S. Steel*, 182 N.E.3d at 842.

[33] Indiana has long had a statutory right to a mechanic's lien. *Id.* at 842–43. Although the precise language of the IMLS "has differed, it has continually conferred broad rights on suppliers." *Id.* at 843. The current version of the IMLS provides that

A contractor, a subcontractor, a mechanic, a lessor leasing construction and other equipment and tools, whether or not an operator is also provided by the lessor, a journeyman, a laborer, or any other person performing labor or furnishing materials or machinery, including the leasing of equipment or tools, for:
   (1) the erection, alteration, repair, or removal of:
      (A) a house, mill, manufactory, or other building; or
      (B) a bridge, reservoir, system of waterworks, or other structure;
   (2) the construction, alteration, repair, or removal of a walk or sidewalk located on the land or bordering the land, a stile, a well, a drain, a drainage ditch, a sewer, or a cistern; or

(3) any other earth moving operation;
may have a lien as set forth in this section.

Ind. Code § 32-28-3-1(a).

[34] A mechanic's lien applies to "[t]he entire land upon which the building, erection, or other improvement is situated … to the extent of the right, title, and interest of the owner for whose immediate use or benefit the labor was done or material furnished."  Ind. Code § 32-28-3-2(a).  Generally,

> a person who wishes to acquire a lien upon property, whether the claim is due or not, must file in duplicate a sworn statement and notice of the person's intention to hold a lien upon the property for the amount of the claim:
> (1) in the recorder's office of the county; and
> (2) not later than ninety (90) days after performing labor or furnishing materials or machinery[.]

Ind. Code § 32-28-3-3(a).

[35] "The recorded lien relates back to the date the mechanic or other person began to perform the labor or furnish the materials or machinery."  Ind. Code § 32-28-3-5(b).  "Except as provided in subsections (c) and (d), a lien created under this chapter has priority over a lien created after it."  Ind. Code § 32-28-3-5(b).  However,

> (c)  The lien of a mechanic or materialman does not have priority over the lien of another mechanic or materialman.
> (d)  The mortgage of a lender has priority *over all liens created under this chapter* that are recorded *after the date the mortgage was recorded*,

to the extent of the funds actually owed to the lender for the specific project to which the lien rights relate.

Ind. Code § 32-28-3-5(c)–(d) (emphases added).

[36] "A person may enforce a lien by filing a complaint in the circuit or superior court of the county where the real estate or property that is the subject of the lien is situated." Ind. Code § 32-28-3-6(a). "A party seeking a lien must prove it falls within the statute." *U.S. Steel*, 182 N.E.3d at 843 (citing *Premier Invs.*, 644 N.E.2d at 127).

## II.   Applicable Standards of Review

### A.   Summary Judgment

[37] When reviewing a trial court's order granting or denying summary judgment, "our standard of review is the same as that of the trial court." *Webb v. City of Carmel*, 101 N.E.3d 850, 860 (Ind. Ct. App. 2018).

> We stand in the shoes of the trial court and apply a de novo standard of review. Our review of a summary judgment motion is limited to those materials designated to the trial court. Summary judgment is appropriate only where the designated evidence shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. For summary judgment purposes, a fact is "material" if it bears on the ultimate resolution of relevant issues. We view the pleadings and designated materials in the light most favorable to the non-moving party. Additionally, all facts and reasonable inferences from those facts are construed in favor of the non-moving party.

*Id.* (internal citations omitted). "The initial burden is on the summary-judgment movant to demonstrate the absence of any genuine issue of fact as to a determinative issue, at which point the burden shifts to the non-movant to come forward with contrary evidence showing an issue for the trier of fact." *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (cleaned up).

## B. Findings & Conclusions

[38] In cases where the trial court enters findings of fact and conclusions thereon, our standard of review is two-tiered:

> [W]e first determine whether the evidence supports the trial court's findings and second, we determine whether the findings support the judgment. Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. In determining whether the findings on the judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom.
>
> In conducting our review, we cannot reweigh the evidence or judge the credibility of any witnesses, and must affirm the trial court's decision if the record contains any supporting evidence or inferences. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions.

*Roberts v. Feitz*, 933 N.E.2d 466, 475–76 (Ind. Ct. App. 2010) (internal citations omitted, emphasis in original).

## C.  Motion to Correct Error

We review an order granting or denying a motion to correct error for abuse of discretion. *In re Paternity of V.A.*, 10 N.E.3d 65, 67 (Ind. Ct. App. 2014). "An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before the court, or the reasonable inferences [drawn] therefrom." *Id.*

# III.  Analysis

## A.  Validity/Scope of Mechanic's Liens

Both ZPS and EdgeRock challenge the trial court's determination that Garmong's and Fox's mechanic's liens were valid. In addition, ZPS contends that the trial court erred by allowing Signworks to include costs for materials that were never installed on its property in their mechanic's liens against ZPS's property.

### *1.  Breadth and Scope of Mechanic's Liens*

In 1896, the Indiana Supreme Court held that

> [w]here labor is performed or materials furnished under one contract upon several buildings, *all situate[d] upon one lot of land belonging to the contracting owner*, the lien attaches to all the land for the whole value of the labor performed, and it is immaterial whether the contract specifies one sum for all work or separate amounts for each building.

*Premier Steel Co. v. McElwaine-Richards Co.*, 144 Ind. 614, 619, 43 N.E. 876, 877–78 (1896) (emphasis added, internal quotation omitted).  The Supreme Court went on to say, however, that "[i]f the work be done or materials are furnished upon distinct premises, *the lien must be against each of the several premises, according to the value of the work and materials incorporated in each*, and not against both for the aggregate amount."  *Id.* at 620, 43 N.E. at 878 (emphasis added).  More recently, we have stated that

> unless, a joint lien is appropriate because work was done on, or materials were supplied for, more than one structure on a single tract of land, pursuant to one contract, a lien may not be had on one structure for work done on or materials furnished for a different structure.

*Cato v. David Excavating Co.*, 435 N.E.2d 597, 605 (Ind. Ct. App. 1982), *overruled on other grounds by Johnson v. Blankenship*, 688 N.E.2d 1250 (Ind. 1997) (internal citations omitted).

[43]   The question before us is, when work is completed on multiple parcels of land, whether a mechanic's lien can encompass all costs associated with the project as a whole or must be restricted in some fashion as it relates to the encumbered parcel.  Indiana Code section 32-28-3-1(b)(2) states that

> A person … may have a lien separately or jointly … on the interest of the owner of the lot or parcel of land:
> > (A) on which the structure or improvement stands; or
> > (B) with which the structure or improvement *is connected*;

to the extent of the value of any labor done or the material furnished, or both, including any use of the leased equipment and tools.

(Emphasis added). The parties dispute the meaning of the term "connected" with Garmong and Fox requesting that we define the term "connected" broadly and ZPS and EdgeRock requesting that we apply a narrower definition of the term, *i.e.*, a definition that would require common ownership of the land in question.

[44] In support of its request for a broad interpretation of the term "connected," Garmong points to this court's decision in *West v. Dreher*, 73 Ind. App. 133, 136, 126 N.E. 688, 689 (1920), in which we concluded that a mechanic's lien applied equally to homes built on two adjoining parcels under one contract because "the two houses, within the mechanic's-lien law of this State, are one piece of work." However, our decision in *West* does not support an interpretation as broad as that requested by Garmong because in *West*, the two parcels were owned by the same individual, 73 Ind. App. at 134, 126 N.E. at 688, and we cannot say that our conclusion would have been the same if the lots had been owned by different individuals. Garmong also points to our decision in *Windfall Natural Gas, Mining & Oil Co. v. Roe*, 42 Ind. App. 278, 85 N.E. 722 (1908), *overruled on other grounds by Cline v. Indianapolis Mortar & Fuel Co.*, 65 Ind.

App. 383, 117 N.E. 509 (1917), another case involving common ownership.[3] For its part, Fox cites to our decision in *Inter-City Contractors Services, Inc. v. Consumer Building Industries, Inc.*, 175 Ind. App. 665, 373 N.E.2d 903 (1978), for the proposition that a mechanic's lien could be asserted against numerous lots for collective work completed under a single contract. However, *Inter-City* also does not support the broad interpretation of the term "connected" favored by Fox and Garmong as it dealt with a single parcel owned by a single entity that was subsequently divided into numerous lots. *Id.* at 667–68, 373 N.E.2d at 905.[4]

[45] For their part, ZPS and EdgeRock assert that the cases cited by Garmong and Fox actually support their position, *i.e.*, that applicable Indiana authority applies a narrower interpretation of the term "connected" as it requires common ownership. Based on our reading of the relevant Indiana authority, we must agree. *See, e.g., Windfall*, 42 Ind. App. at 280, 85 N.E. at 723 (providing that a joint lien may be had upon work completed under a single contract when the parcels are *connected in construction and ownership*). This interpretation is consistent with our decision in *O.J. Shoemaker, Inc. v. Board of Trustees of General Retirement System of City of Detroit*, 479 N.E.2d 1349, 1351

---

[3] While Garmong does not cite to any Indiana authority that would support the broad interpretation it is requesting, it does cite *Deegan v. Kilpatrick*, 66 N.Y.S. 628 (1900) and *Caird Engineering Works v. Seven-Up Gold Mining Co.*, 111 P.2d 267 (Mont. 1940). However, to the extent that *Deegan* and *Caird* can be read as supporting Garmong's position, we are not bound by either case.

[4] Fox also cites to the United States Supreme Court's opinion in *Phillips v. Gilbert*, 101 U.S. 721 (1879), but that case also appears to involve common ownership of all of the land at issue.

(Ind. Ct. App. 1985), in which we acknowledged that "a lien may not be had on one structure for work done on or materials furnished for a different structure[.]"[5] We interpret relevant Indiana authority as requiring common ownership before a mechanic's lien can be levied against a parcel for work that has been completed on numerous parcels. Applying this interpretation to the facts of this case, we turn our attention to the question of whether the trial court erred in determining that Garmong's and Fox's mechanic's liens against ZPS's property and EdgeRock's property were valid.

*i.      Arguments Relating to Garmong's and Fox's Liens on ZPS's Property*

[46]     ZPS argues that "[t]he trial court's finding that ZPS must pay, as part of a mechanic's lien, for work performed on property ZPS does not own is unprecedented and inconsistent with Indiana law." ZPS's Appellant's Br. p. 29. ZPS succinctly states, "Indiana law doesn't allow a contractor to lien one property for work performed on another without common ownership." ZPS's Reply Br. p. 12. ZPS points out that despite having been given the opportunity to do so, neither Fox nor Garmong was able to prove the value of the work actually performed on ZPS's property.

---

[5] In support of this interpretation, ZPS additionally cites to *New England Savings Bank v. Meadow Lakes Realty Co.*, 688 A.2d 345, 348–49 (Conn. App. Ct. 1997), in which the Appellate Court of Connecticut held that a mechanic's lien filed against a property could not include amounts relating to work done on a different parcel that did not enjoy common ownership. While this case could be considered instructive in so far as its holding seems to be consistent with relevant Indiana authority, like the out-of-state cases cited by Garmong, it is not binding precedent.

### a. Garmong's Lien

[47]     ZPS claims that the evidence established that the amount of Garmong's lien includes amounts for work performed on its property, EdgeRock's property, and Dahm's property. Garmong's Regional Manager, Mitch Hannum, who had been involved with calculating the amount of the lien, testified at trial as follows:

> Q:     And so the amount of the lien that Garmong recorded on [ZPS's] property is exactly the same as the amount of the lien it recorded on EdgeRock's property. Is that correct?
> A:     Yes.
> Q:     The two liens cover the same scope of work, right?
> A:     Yeah, it was one project.
> Q:     And they both include work that took place on Lots 1, 2, 3, 4, and 5, correct?
> A:     *That is correct*.
> Q:     So [ZPS] owns Lots 1 and 2, but the lien that Garmong recorded on this property includes work that was done on Lots 3, 4, and 5.
> A:     *Yes*.
> ****
> Q:     So at the time that Garmong executed the ZPS lien, it knew that the amount it was claiming included work performed on Lots 3, 4, and 5. Is that correct?
> A:     We recorded liens for the entire project. *So, yes, we knew when we filed liens that work was done on all of the five parcels because we performed work on all of the five parcels*.
> Q:     And the amount that you were claiming in ZPS's lien, you knew at the time you executed the lien that it included amounts that Garmong claimed it was owed for work on Lots 3, 4, and 5.
> A:     Yes, I believe I just - I believe that's what I just said, yes. Yes.

Tr. Vol. III pp. 14–15 (emphases added). In addition, Michael Preyss, Garmong's Chief Financial Officer, testified that he did not know "how much of this $1,009,055.62 that is set forth in the mechanic's lien on [ZPS's] property relates to work performed on" ZPS's property. Tr. Vol. III p. 224. Preyss further admitted that he could not "sit here telling you that X dollars went to this particular parcel of land and Y dollars went to this other particular parcel of land." Tr. Vol. III p. 223.

[48] ZPS claims that Hannum's and Preyss's testimony "unequivocally established that the Garmong lien on ZPS's Property included work on property that ZPS did not own." ZPS's Appellant's Br. p. 42. Further, although Garmong asserts otherwise, review of the invoices referenced by Garmong's counsel indicates that the invoices do not appear to have included only work that benefited ZPS's property. In sum, ZPS argues that "Garmong's executives were right: Garmong's lien on ZPS's Property includes amounts for work performed on Edge[R]ock's Property and Dahm's Property. This is fatal to Garmon's lien claim against ZPS's Property and the trial court's Judgment enforcing Garmong's mechanic's lien against ZPS's Property should be reversed." ZPS's Appellant's Br. pp. 44–45. We must agree with ZPS. Based on the evidence presented to the trial court, we conclude that Garmong's mechanic's lien was overstated such that it included costs associated with work that had not been completed on ZPS's property.

[49] In *Abbey Villas Development Corp. v. Site Contractors, Inc.*, 716 N.E.2d 91, 100–01 (Ind. Ct. App. 1999), we noted that where a claimant has intentionally or

through culpable negligence overstated the amount due to him, such overstatement will render his lien void, but mere mistake will not necessarily render the whole lien void when it is clear that no fraud was intended and the claimant had not misled the defendant to his prejudice. Garmong asserts that to the extent that its mechanic's lien against ZPS's property was overstated, such overstatement was not intentional or the result of culpable negligence. We conclude, however, that the evidence demonstrates otherwise. Hannum's and Preyss's testimony unequivocally established that the Garmong's mechanic's lien included work on property that ZPS did not own, and that Garmong had known as much when it had filed its lien. As such, we conclude that Garmong's knowing overstatement rendered its mechanic's lien against ZPS's property void.[6] *See Abbey Villas*, 716 N.E.2d at 100–01.

### b. Fox's Liens

ZPS claims that the majority of Fox's work on the 175th-Street Project did "not even touch Lots 1 and 2" and "it is undisputed that Fox's lien includes amounts for work performed on property not owned by ZPS." ZPS's Appellant's Br. p. 32. ZPS points to the trial testimony of Fox employee Don Adamson, who testified that he did "not know the value of the work that Fox performed on Lots 1 and 2 related to the 175th Street project" and that none of the line items charged in relation to the street construction related exclusively to work

---

[6] Because we conclude that Garmong's mechanic's lien against ZPS's property is void, it follows that the award of prejudgment interest that was awarded in conjunction with and as part of the lien is extinguished.

completed on Lots 1 and 2.  Tr. Vol. IV p. 241.  Adamson admitted that he had "no idea how to put a value on" the work Fox completed as it relates to ZPS's property and that he "would have no way to know what the value of the work is."  Tr. Vol. IV pp. 242, 243.  Given the lack of evidence relating to the value of Fox's work on the 175th-Street Project on Lots 1 and 2, ZPS claims that Fox knowingly overstated its mechanic's liens on ZPS's property.

[51]  The trial court appeared to acknowledge that Fox's mechanic's liens may have been overstated as it related to ZPS, finding that "even if they were [overstated], they were not intentionally or negligently overstated."  Appellants' Jt. App. Vol. 2 p. 156.  ZPS asserts that, contrary to the trial court's finding that the overstatement was not intentional or negligent, given the evidence demonstrating that Fox had known when it had asserted the lien that the lien had included costs associated with work that was not done on ZPS's property, its overstatement was intentional.  ZPS also asserts that the prejudice in this regard was self-evident.  We agree with ZPS on both assertions.

[52]  ZPS claims that Fox failed to prove that its mechanic's liens represented the value of its work on ZPS's property, noting that it did not bear the burden of disproving the value but rather that Fox had the burden to prove the value of its work.  ZPS points to the fact that a large portion of Fox's work was completed on Lot 3, which ZPS asserts provided no value to its property.  ZPS also claims that it did not benefit from the installation of the water and sewer work as it already had access to water and does not tie into the new sewer line, which allows Lot 4 access to the sewer system.  Thus, ZPS claims that "[t]his water

line and sewer lateral work provided no benefit whatsoever, directly or indirectly, to ZPS's property—yet because Fox included it in its lien against ZPS's Property, the trial court's judgment forces ZPS to pay for it." ZPS's Appellant's Br. p. 36.

[53] In arguing that it would be inequitable for it to bear the complete cost of the 175th-Street Project, ZPS points to the fact that its property constitutes only 10.2% of the property adjoining 175th Street. Fox seems to merely assert that its work was common-infrastructure work that benefitted all five lots, including ZPS's property. Again, Adamson testified that he had "no way to know the value of the work" on ZPS's property but acknowledged that the work on 175th Street had benefited property owned by EdgeRock and Dahm. Tr. Vol. IV p. 243. In sum, ZPS asserts that "Fox's inclusion of amounts in its mechanic's liens that did not benefit ZPS, or for work which was not performed on ZPS's Property and benefited multiple property owners, means it intentionally or negligently overstated its liens and thus they are void." ZPS's Reply Br. p. 25.

[54] Similar to our conclusion relating to Garmong, we conclude that the evidence demonstrates that Fox's mechanic's lien included work on property that ZPS did not own, and that Fox had known as much when it had filed the lien. As such, we conclude that Fox's knowing overstatement rendered its mechanic's lien against ZPS's property void. *See Abbey Villas*, 716 N.E.2d at 100–01.

*ii.    Arguments Relating to Garmong's and Fox's Liens on EdgeRock's Property*

[55]  At the summary-judgment stage, EdgeRock, Garmong, and Fox sought determinations as to the validity of Garmong's and Fox's mechanic's liens against EdgeRock's property.  On April 7, 2021, the trial court determined that "Garmong's mechanic's lien on Edge[R]ock's property is valid as a matter of law."  Appellants' Jt. App. Vol. 2 p. 71.  On May 13, 2021, the trial court likewise determined that Fox's mechanic's liens, which related to both its direct contract with EdgeRock and the Garmong subcontract, were valid as a matter of law.  In finding both Garmong's and Fox's mechanic's liens to be valid as a matter of law, the trial court determined that the liens had been timely filed and that neither Garmong nor Fox had overstated the amount of its lien.  Following trial, the trial court reaffirmed its earlier determination that Garmong's and Fox's mechanic's liens against EdgeRock's property were valid.

[56]  EdgeRock argues that both Garmong's and Fox's liens should have been found invalid as a matter of law because neither Garmong nor Fox limited their liens to costs associated with work completed on EdgeRock's property but included costs associated with work done on property owned by ZPS and Dahm. EdgeRock asserts that as a result of Garmong's and Fox's failure to separate out the costs associated with work done on each individual property owner's property,

> [t]here are now effectively $4.8 million dollars' worth of liens on lots owned by different people/entities when it is undisputed that the cumulative amount owed is only $1.2 million.  And on top of that, the lien on Lot 3 has been removed altogether so that the

only lot benefiting from the work done on Lot 3 is not even in the mix anymore. It is inequitable to allow Fox to pursue only ZPS and EdgeRock without deducting the real, tangible value provided by their work to Lot 3.

EdgeRock's Appellant's Br. p. 55.

[57] Garmong claims that EdgeRock's status as the developer for the Project subjected it to liability for the entire contract amount. Garmong asserts that if EdgeRock "is allowed to avoid the liens, the result is anything but equitable" and EdgeRock "should not be permitted to subdivide Garmong's lien rights for the project to avoid paying Garmong." Garmong's Appellee's Br. p. 43. Fox also claims that it would be inequitable for EdgeRock "to receive the benefit and value of Fox's infrastructure work without having Edge[R]ock pay for it." Fox's Appellee's Br. p. 55. While both Garmong and Fox could clearly have received, and in fact did receive, money judgments against EdgeRock for the unpaid amount due under the parties' contracts, it does not necessarily follow that Garmong and Fox could assert mechanic's liens for work done on another's property against EdgeRock's property.

[58] The parties have not cited to any Indiana authority creating an exception to the common-ownership requirement that would extend EdgeRock's liability such that its property can be encumbered by money owed for work done on another's property by virtue of its status as the Project developer. We conclude that the rationale for our conclusions relating to Garmong's and Fox's

mechanic's liens on ZPS's property apply equally to the liens on EdgeRock's property.  We further conclude, therefore, that the liens were overstated.

[59] The evidence set forth in the preceding section establishes that both Garmong and Fox had known at the time they recorded their mechanic's liens that the lien amounts included work that had been completed on all five parcels.  Thus, Garmong and Fox overstated their lien amounts when they recorded their mechanic's liens against EdgeRock's property.  Like their liens against ZPS's property, their knowing overstatement has rendered their liens void.  *See Abbey Villas*, 716 N.E.2d at 100–01.  This conclusion, however, has no effect on the trial court's determination that EdgeRock had breached its contracts with both Garmong and Fox or the resulting breach-of-contract judgments entered against EdgeRock.

*iii.     Signworks's Lien*

## a.     Inclusion of Costs Relating to Non-Installed Materials

[60] ZPS also contends that the trial court erred in allowing Signworks to include the cost of materials purchased—but not installed on ZPS's property— in its mechanic's liens.  ZPS cites to our opinion in *Cho v. Purdue Research Foundation*, 803 N.E.2d 1161, 1172 (Ind. Ct. App. 2004), for the proposition that a contractor "cannot maintain a mechanic's lien for the value of the materials and equipment purchased but not installed or delivered."  *See also Stanray Corp. v. Horizon Const., Inc.*, 168 Ind. App. 164, 177, 342 N.E.2d 645, 653 (1976) (providing that a lien can only include materials furnished to a property owner,

which means that the materials have both been ordered and delivered to the property owner). ZPS reiterates that because "the whole point of the mechanic's lien remedy" is to prevent unjust enrichment to an owner's property, [Signworks] should not be able to recover the costs of the challenged materials which "did not improve ZPS's Property." ZPS's Reply Br. p. 32.

[61] ZPS claims that Signworks's mechanic's lien for $93,268.37 included

> $27,500[.00] for what Signworks described as "materials presently stored." It is undisputed that Signworks did not perform all of the work called for in the contract as, among other things, it has yet to install cabinets and toppers. These materials are still being stored in Signworks'[s] warehouse, where they remain crated and packed.

ZPS's Appellant's Br. p. 50 (internal record citations omitted). ZPS asserts that "[p]er *Cho*, … the value of these cabinets and toppers should not have been included in the Judgment; the principal amount of the judgment in favor of Signworks should be reduced by $27,500[.00]." ZPS's Appellant's Br. p. 50.

[62] Signworks argues that it can recover for the materials in question, which it asserts were custom-fabricated for the Project. In support, Signworks cites to our opinion in *Jackson v. J.A. Franklin & Son*, 107 Ind. App. 38, 41–42, 23 N.E.2d 23, 25 (1939), in which we concluded that "[i]t is not *always* necessary to show that the material went into the building. Circumstances in a given case may be such that the owner of the building is estopped from invoking the general rule." (Emphasis in original as published in the Indiana Appellate Court Reports). Signworks further cites to our decision in *Foster Lumber Co. v.*

*Sigma Chi Chapter House of De Pauw Univ.*, 49 Ind. App. 528, 532, 97 N.E. 801, 802 (1912), in which we concluded that "[t]he materialman is properly said to have 'furnished' the materials when he had delivered or has them ready for delivery at the place where he has agreed to deliver them under the contract." (Internal quotation omitted). Signworks asserts that the only reason the materials were not installed was because EdgeRock had breached their contract. Thus, under the circumstances of this case, Signworks argues that it should be able to recover for the uninstalled materials.

[63] We find our decisions in *Cho* and *Stanray* to be instructive on this question. In these cases, we concluded that materials are "furnished" when "ordered for *and* delivered." *Stanray*, 168 Ind. App. at 177, 342 N.E.2d at 653 (emphasis added). As such, we conclude that Signworks's mechanic's lien was overstated to the extent that it included the $27,500.00 value of the uninstalled materials. However, unlike the Garmong and Fox liens, we do not conclude that the overstatement was made in a knowing or negligent fashion as there was a good-faith dispute as to whether the costs could be included. As such, we conclude that Signworks's overstatement did not render its mechanic's lien void. *See Abbey Villas*, 716 N.E.2d at 100–01 (providing that mere mistake in overstatement will not necessarily render a mechanic's lien void when it was clear that there was no fraud intended). On remand, we therefore instruct the trial court to reduce Signworks's mechanic's lien to eliminate the cost of the uninstalled materials.

### b. Inclusion of Prejudgment Interest

[64] ZPS also contends that the trial court erred in including an award of prejudgment interest in Signworks's mechanic's lien.

> When reviewing a decision regarding an award of prejudgment interest, our standard of review is for an abuse of discretion, focusing on the trial court's threshold determination as to whether the facts satisfy the test for making such an award. *Harlan Sprague Dawley, Inc. v. S.E. Lab Group, Inc.*, 644 N.E.2d 615, 617 (Ind. Ct. App. 1994), *trans. denied*. The decision to award prejudgment interest rests on a factual determination and this court may only consider the evidence most favorable to the judgment. *Id.*

> We note that the crucial factor in determining whether damages in the form of prejudgment interest are allowable is whether the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation. *Id.* at 618. An award of prejudgment interest is proper only where a simple mathematical computation is required. *Brane v. Roth*, 590 N.E.2d 587, 593 (Ind. Ct. App. 1992), *trans. denied*. *Damages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest. Id.*

*Bopp v. Brames*, 713 N.E.2d 866, 872 (Ind. Ct. App. 1999) (emphasis added), *trans. denied*.

[65] While the amount owed to Signworks under its contract with EdgeRock was not in dispute, as it related to ZPS, ZPS and Signworks were engaged in a good-faith dispute regarding the amount of damages that should be included in Signworks's mechanic's lien both below and on appeal. Again, "damages that

are the subject of a good faith dispute cannot allow for an award of prejudgment interest." *Id.* As such, we conclude that the trial court abused its discretion in including an award of prejudgment interest in Signworks's mechanic's lien on ZPS's property. *See Clark v. Hunter*, 861 N.E.2d 1202, 1208 (Ind. Ct. App. 2007) (providing that damages that are the subject of a good-faith dispute cannot allow for an award of prejudgment interest nor is an award proper when the trial court must exercise its judgment to assess the amount of damages).[7] On remand, we instruct the trial court to remove the award of prejudgment interest from Signworks's mechanic's lien.

## B. Priority Questions

[66] Given our conclusion that Garmong's and Fox's mechanic's liens against EdgeRock's property are invalid, there is no longer any question as to whether the liens have priority over any portion of the First Bank Mortgage because the liens no longer exist. Moreover, it is clear under Indiana law that the First Bank Mortgage has priority over the subsequently-entered judgments entered against EdgeRock in connection with Garmong's, Fox's, and Signworks's breach-of-contract claims. *See Huntingburg Prod. Credit Ass'n v. Griese*, 456 N.E.2d 448, 452 (Ind. Ct. App. 1983) ("A judgment lien is subordinate to all prior conveyances and mortgages and all existing loans and equities in favor of

---

[7] While the trial court abused its discretion in awarding prejudgment interest as it relates to ZPS, we again note that no similar good-faith dispute as to damages exists as it relates to Signworks's breach-of-contract action against EdgeRock. As such, the award of prejudgment interest that was awarded in relation to Signworks's breach-of-contract action against EdgeRock stands.

third persons."). On remand, we therefore instruct the trial court to grant the First Bank Mortgage priority over all remaining encumbrances on EdgeRock's property that are at issue in this case.

## C.   Challenged Summary Judgment Rulings

[67]   EdgeRock has challenged two of the trial court's summary judgment rulings, which, if found erroneous, could potentially affect the amount of Garmong's breach-of-contract judgment against it.

### 1.   *Change Order 3*

[68]   EdgeRock asserted below that it had not approved Change Order 3 and sought summary judgment on the issue. In requesting summary judgment, EdgeRock had claimed that "Garmong could not recover amounts incurred pursuant to Change Order #3 because EdgeRock never approved this Change Order in writing as unambiguously required under the contract" and had designated supporting evidence. EdgeRock's Appellant's Br. p. 63. For its part, Garmong designated evidence indicating that EdgeRock had orally approved Change Order 3 and had paid seventy-five percent of the amount due for Change Order 3 without complaint.

[69]   The trial court denied EdgeRock's request for summary judgment, finding that issues of fact precluded summary judgment. Specifically, the trial court found that

> Damian Etchison and Mitch Hannum both testified that
> Edge[R]ock orally approved Change Order 3. This testimony

contradicts [EdgeRock's manager Birch] Dalton's testimony and creates an issue of fact precluding summary judgment. Edge[R]ock provided Garmong with the revised civil drawings that were prepared by **Edge[R]ock's own** civil engineer and asked Garmong to carry out the work depicted on those revised civil drawings. If Garmong had not carried out Change Order 3, construction on the Project could not have begun. All site activity would have stopped after demolition.

Edge[R]ock also paid for seventy-five percent of Change Order 3. When negotiating the $2.1 million payment for the release of the November 2018 mechanic's lien, Edge[R]ock did not assert that Change Order 3 was not approved. Edge[R]ock also claims in its brief that the $2.1 million payment was a final payment, so Edge[R]ock believes it has paid for the Change Order 3 work in full.

Edge[R]ock paying for the Change Order 3 work gives rise to the inference that Edge[R]ock approved Change Order 3. The Court must construe all inferences that can be drawn from the designated evidence in Garmong's favor. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). A reasonable factfinder could conclude from Edge[R]ock's payment of Change Order 3 that Edge[R]ock approved the Change Order. Thus, there is an issue of fact for trial.

Appellants' Jt. App. Vol. 2 pp. 66–67 (emphasis in original, internal record citation omitted).[8]

---

[8] Following trial, the trial court found that Change Order 3 was valid. EdgeRock does not appear to specifically challenge the trial court's findings and conclusions relating to Change Order 3 in its final order, instead focusing its argument on its belief that it had been entitled to summary judgment on this issue.

[70]     We agree with the trial court that the designated evidence created an issue of material fact as to whether EdgeRock had approved Change Order 3. The designated evidence established that EdgeRock had orally approved other change orders and had paid for seventy-five percent of the charges related to Change Order 3 without objection. Witness statements also provided conflicting evidence as to whether EdgeRock had orally approved Change Order 3 before the included work commenced. The Indiana Supreme Court has recognized that a contract providing that any modification must be in writing may nevertheless be modified orally. *See AM General LLC v. Armour*, 46 N.E.3d 436, 443 n.3 (Ind. 2015) (citing *Sees v. Bank One, Ind., N.A.*, 839 N.E.2d 154, 161 (Ind. 2005)). Upon reviewing the parties' designated evidence, the trial court determined that issues of material fact existed. Like the trial court, we conclude that the designated evidence created an issue of material fact. As such, we affirm the trial court's denial of summary judgment as to Change Order 3.

## 2.  Scope-of-Work Question

[71]     EdgeRock and Garmong filed competing motions for summary judgment on the question of whether the 175th-Street Project and the relocation of the Drain were included in the scope of work covered by the EdgeRock-Garmong contract. EdgeRock claimed below that this work was included in the parties' contract and, because Garmong did not complete this work and EdgeRock was forced to contract with Fox to complete the work, EdgeRock was entitled to

credit for costs associated with this work that had been paid to Garmong. The

trial court found, as a matter of law, that

> [t]he scope of work listed in the contract did not include the
> [175th-Street Project] or the drain relocation. These items were
> thus not removed from Garmong's scope of work as they were
> never part of Garmong's scope of work to begin with.
> Edge[R]ock is not entitled to a contractual credit for the [175th-
> Street Project] or the drain relocation.

Appellants' Jt. App. Vol. 2 pp. 64–65. EdgeRock argues on appeal that the trial

court erred in granting summary judgment in favor of Garmong on this issue.

[72] The designated evidence demonstrated that the EdgeRock-Garmong contract

provided that the contract sum was guaranteed "not to exceed" $3,255,390.00.

Appellants' Jt. App. Vol. 2 p. 225. The scope of work included in the contract

was detailed in Exhibit B of the contract. Exhibit B outlined both the work that

was to be completed by Garmong and the budget for said work. The budget

breakdown provided as follows:

| ITEM | DESCRIPTION | LOTS 1 & 2 | INFRASTRUCTURE | TOTAL |
|---|---|---|---|---|
| 0000 | General Conditions | $81,915 | $123,485 | $205,400 |
| 0210 | Structure Demolition | $0 | $135,000 | $135,000 |
| 0331 | Structural Concrete | $42,299 | $0 | $42,299 |
| 0400 | Masonry | $136,450 | $0 | $136,450 |
| 0510 | Structural Steel | $129,331 | $0 | $129,331 |
| 0742 | Metal Panels | $45,700 | $0 | $45,700 |
| 0750 | Membrane Roofing | $66,700 | $0 | $66,700 |
| 0746 | Siding | $39,631 | $0 | $39,631 |
| 0840 | Entrances and Storefronts | $50,400 | $0 | $50,400 |
| 0920 | Drywall and Framing | $161,500 | $0 | $161,500 |
| 0990 | Painting | $5,500 | $0 | $5,500 |
| 2300 | Plumbing and HVAC | $69,376 | $0 | $69,376 |
| 2600 | Electrical | $89,800 | $55,400 | $145,200 |
| 3120 | Earth Moving | $98,552 | $1,179,997 | $1,278,549 |
| 3210 | Asphalt Paving | $81,595 | $101,156 | $182,751 |
| 3216 | Site Concrete | $43,650 | $82,673 | $126,323 |
| 3231 | Fences and Gates | $3,250 | $7,000 | $10,250 |
| 3290 | Landscaping | $16,519 | $45,572 | $62,091 |
| 7% | SALES TAX | $9,947 | $0 | $9,947 |
| SUBTOTALS | | $1,172,114 | $1,730,284 | $2,902,398 |
| | CONTINGENCY | $32,054 | $77,946 | $110,000 |
| 8% | FEE | $96,109 | $144,883 | $240,992 |
| TOTAL | | $1,300,277 | $1,953,113 | $3,253,390 |

Appellants' Jt. App. Vol. 2 p. 240. As the budget breakdown indicates, $1,300,277.00 was budgeted for work that was to be completed on Lots 1 and 2 and $1,953,113.00 was budgeted for infrastructure work. EdgeRock asserts that the infrastructure work included all work that was needed to complete the 175th-Street Project and to relocate the Drain. While the budget sheet does include costs in the infrastructure portion for "Asphalt Paving," which, in theory, could have been part of the funds necessary to construct 175th Street, the budget breakdown does not appear to include any costs that would appear to apply to drain relocation as "$0" was allocated to plumbing. Appellants' Jt. App. Vol. 2 p. 240.

[73] In finding that the 175th-Street Project and the relocation of the Drain were not included in the scope of work of the EdgeRock-Garmong contract, the trial court noted that adopting EdgeRock's interpretation of the included scope of work would require it to violate the principles of contract interpretation and to rewrite the parties' contract. Specifically, the trial court determined that

> Adopting Edge[R]ock's reading would require the Court to strike out the eight pages of the Guaranteed Maximum Price Amendment listing the scope of work. That portion of the Guaranteed Maximum Price Amendment would serve no purpose if the true scope of work was all the work depicted in the drawings.
>
> Garmong's reading of the contract by contrast harmonizes the whole contract without eliminating any part of it. The only reading that makes the document into a cohesive whole is that the drawing log lists the source material for the narrower eight-page scope of work to be undertaken by Garmong. Garmong's reading is also consistent with the drawings themselves, which depict a phased project. Edge[R]ock's reading of the contract would eliminate the phased aspect of the Project as Garmong would be carrying out all phases at once.

Appellants' Jt. App. Vol. 2 p. 64.

[74] We agree with the trial court that the designated evidence establishes as a matter of law that the 175th-Street and Drain projects were not included in the scope of work set forth in the EdgeRock-Garmong contract. In claiming that these projects were included, or that a question of material fact existed as to whether they were, EdgeRock points to the following pictures which it claims prove that drain-relocation work was "foundational work that had to be

completed at the beginning of the Project" and thus must have been included in the EdgeRock-Garmong contract:





EdgeRock's Reply Br. p. 22 (noting that the original pictures could be found at Ex. Vol. 19 pp. 4, 7 but that it had added the arrows and boxes). EdgeRock argues that these pictures, when considered together with the budget line item

including $1,179,997.00 for earth moving, with a separate amount included for earth moving on Lots 1 and 2, "provide the plans for moving the stream and drain as part of the base contract." EdgeRock's Reply Br. p. 23. We disagree. Rather, we conclude that the pictures relied on by EdgeRock fall short both of proving or creating an issue of material fact as to whether that drain-relocation work was included in the EdgeRock-Garmong contract as they merely depict where the original drain was and to where it was subsequently relocated but do not address whether the cost was included in the EdgeRock-Garmong contract. Because the designated evidence falls short of either proving EdgeRock's proffered interpretation or creating an issue of material fact on the question, we further conclude that the award of summary judgment in favor of Garmong on the scope-of-work question was appropriate.

## D.   RIF Funds

[75]   Noting First Bank's secured interest in the RIF Funds, the trial court initially awarded the RIF Funds to First Bank. In doing so, the trial court rejected Fox's claim to the RIF Funds. In its order on the parties' motions to correct error, the trial court acknowledged that ZPS had filed suit against EdgeRock in Cause No. PL-5088 and that that action was pending. The trial court amended its prior order to award the RIF Funds to EdgeRock. EdgeRock claims that the trial court's determination is correct because pursuant to its contract with the City, it is entitled to the RIF Funds.

[76]   First Bank contends that the trial court's original order was correct with respect to the RIF Funds because it holds a first-priority secured interest in the RIF

Funds. First Bank argues that the RIF Agreement was a contract between the City and EdgeRock and that Fox has no claims to the RIF Funds under the contract and that Fox's claim on the RIF Funds is not supported by law. First Bank likewise argues that ZPS has no claim to the RIF Funds as it has failed to offer any evidence *in the instant case* which supports ZPS's assertion that it has a secured interest in the funds. Furthermore, to the extent that Fox and others assert that First Bank is not entitled to the RIF Funds because it had not asserted a judicial claim against the funds, First Bank argues that it was not required to do so.

[77] Fox contends that it is entitled to the RIF Funds. In support of its claim, Fox notes that it brought the City into the litigation and asserts that it was the only party to incur any costs associated with or do any of the work on the 175th-Street Project. Fox asserts that the use of impact fees, such as the RIF Funds, are controlled by Indiana Code section 36-7-4-1300 *et seq.*, which indicates that such funds are to be used to mitigate costs directly in connection with projects for the construction of infrastructure, such as roads, public ways, bridges, drains, and drainage. *See* Ind. Code §§ 36-7-4-1305, -1309. Fox claims that because it built the 175th-Street Project but was never paid for its work, it is entitled to the RIF Funds. Fox argues that while other entities have claimed to have a right to the RIF Funds, it was the only party to assert a formal claim for

the funds in the instant lawsuit.[9]  Fox also argues that EdgeRock was not entitled to the RIF Funds because it had not incurred any costs associated with the 175th-Street Project.  EdgeRock contests this argument, claiming that due to the allegedly substandard quality of Fox's work, it had to hire another contractor to finish the job.  Fox does not have a secured interest in the RIF Funds.

[78]  For its part, ZPS contends that it has a secured interest in the RIF Funds.  It asserts, however, that "[g]iven the multiple interests in the RIF Funds, many of which were not represented or addressed in this action, and given that Edge[R]ock did not even assert a claim to the RIF Funds, the trial court's award was erroneous and must be reversed."  ZPS's Appellant's Br. p. 57.  ZPS asserts that as of May 24, 2021, EdgeRock owed ZPS $441,879.52 and that in relation to this debt, ZPS had secured its interest in the RIF Funds.  ZPS argues that "[e]ntitlement to the RIF Funds should be determined by the Hamilton County Commercial Court, where all entitles with a secured interest in Edge[R]ock's assets are parties."  ZPS's Reply Br. p. 49.  Thus, ZPS claims that we should "reverse the award of RIF Funds to Edge[R]ock and remand with instructions to the Hamilton County Clerk to continue holding the RIF Funds pending resolution of" Cause No. PL-5088.  ZPS's Reply Br. p. 54.

---

[9] Fox classifies First Bank's claimed interest in the RIF Funds as being a private debt obligation that was unrelated to the construction of 175th Street.

[79]    Given that at least one party, *i.e.*, First Bank, has a secured interest in the RIF Funds, we conclude that the trial court erred in awarding the RIF Funds to EdgeRock. However, given the allegedly competing secured interests in the funds, not all of which are represented in this action but all of which are represented in Cause No. PL-5088, we instruct the trial court to stay distribution of the funds in this case pending a determination of priority of the competing secured interests by the Hamilton Commercial Court. Moreover, any future rulings by the trial court regarding the RIF Funds should be consistent with the priority determination made by the Hamilton Commercial Court in Cause No. PL-5088.

## E.    Attorney's Fees

### 1.    *First Bank's Request for Attorney's Fees*

[80]    "Indiana adheres to the American rule that in general, a party must pay his own attorneys' fees absent an agreement between the parties, a statute, or other rule to the contrary." *R.L. Turner Corp. v. Town of Brownsburg*, 963 N.E.2d 453, 458 (Ind. 2012). "[A] contract allowing for recovery of attorney['s] fees is enforceable, if the contract is not contrary to law or public policy." *Holliday v. Crooked Creek Vills. Homeowners Assoc., Inc.*, 759 N.E.2d 1088, 1095 (Ind. Ct. App. 2001). "A trial court's decision to award or deny attorney fees is in the exercise of a sound discretion, and in the absence of an affirmative showing of error or abuse of discretion we must affirm the trial court's order." *C.H. v. A.R.*, 72 N.E.3d 996, 1003 (Ind. Ct. App. 2017) (cleaned up). Likewise, "the amount recoverable for an award of attorney fees is left to the sound discretion of the

trial court." *Holliday*, 759 N.E.2d at 1095. "The trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before it." *Id.* In addition, the amount of the trial court's award of attorney's fees must be supported by the evidence. *Id.*

[81] First Bank requested that EdgeRock be ordered to pay its attorney's fees on June 9, 2022. In its petition, First Bank asserted that pursuant to the terms of the parties' mortgage and loan agreement, it is entitled to recover attorney's fees from EdgeRock following a default. First Bank alleged that EdgeRock had defaulted on the loan agreement "as a result of, among other things,: a. after an extension of the maturing date, the loan matured on November 19, 2020; and b. the filing of mechanic's liens by Garmong and Fox, and the failure of [EdgeRock] to pay those mechanic's liens and claims." Appellants' Jt. App. Vol. 18 p. 193. First Bank asserts on appeal that its petition "fully complied with Indiana's standards for awarding attorneys' fees" and was supported by affidavits which included "meticulous breakdowns of the time spent working on Cause No. 29D05-1912-PL-011500 as well as the associated rates charged." First Bank's Appellant's Br. pp. 48–49. The trial court denied First Bank's request for attorney's fees, without explanation, in an order dated July 20, 2022.

[82] On appeal, First Bank argues that the trial court erred in denying its request for attorney's fees. EdgeRock does not appear to challenge First Bank's request for attorney's fees. However, Garmong and Fox challenge First Bank's request for attorney's fees, claiming that "obtaining a judicial finding of default is a precondition to obtaining a fee award" and First Bank "did not ask the trial

court to find that [EdgeRock] defaulted on the note, and the trial court, thus, did not make such a finding." Appellees Garmong & Fox's Jt. Br. p. 45.

[83] With respect to attorney's fees, the First Bank Mortgage documents provide, in relevant part, as follows:

> 18. COLLECTION EXPENSES AND ATTORNEYS' FEES. On or after the occurrence of an Event of Default, to the extent permitted by law, Mortgagor agrees to pay all expenses of collection, enforcement, valuation, appraisal or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Mortgagor agrees to pay expenses for tender to inspect, valuate, appraise and preserve the Property and for any recordation costs of releasing the Property from this Security Instrument. Expenses include, but are not limited to, reasonable attorneys' fees after default and referral to an attorney not a salaried employee of Lender. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Mortgagor.

Ex. Vol. 19 p. 141. The mortgage documents further provide that

> On or after the occurrence of an Event of Default, Lender may use any and all remedies Lender has under state or federal law or in any document related to the Secured Debts. Any amounts advanced on Mortgagor's behalf will be immediately and may be added to the balance owing under the Secured Debts.

Ex. Vol. 19 p. 140.

[84] "It is well settled that a mortgage agreement is a contract." *Cobbum v. Ameritrust Nat. Bank, Michiana*, 580 N.E.2d 969, 971 (Ind. Ct. App. 1991). "As such, the individual parties have a right to define their mutual rights and obligations." *Id.* The language agreed to by First Bank and EdgeRock does not base First Bank's right to recover attorney's fees on a judicial determination that EdgeRock has defaulted on the terms of the mortgage agreement, but rather merely indicates that attorney's fees are "due and payable immediately" following default. Ex. Vol. 19 p. 141. First Bank asserts that EdgeRock has defaulted in two ways, neither of which any party appears to contest occurred. Given First Banks's seemingly undisputed claim that EdgeRock has defaulted on the First Bank Mortgage, we conclude that pursuant to the terms of the First Bank Mortgage, First Bank adequately demonstrated that EdgeRock had defaulted on the parties' agreement, and, as a result, is entitled to attorney's fees pursuant to the express terms of the mortgage agreement.

### 2. *Requests for Appellate Attorney's Fees*

[85] Garmong, Fox, and Signworks each request an award of appellate attorney's fees. The IMLS provides at Indiana Code section 32-28-3-14 that "a plaintiff or lienholder who recovers a judgment in any sum is entitled to recover reasonably attorney's fees." "The statute also encompasses attorney's fees associated with appellate proceedings." *Ambrose v. Dalton Const., Inc.*, 44 N.E.3d 707, 715 (Ind. Ct. App. 2015), *as clarified on reh'g*, 51 N.E.3d 320 (Ind. Ct. App. 2016), *trans. denied*. Given that we have concluded that Garmong's and Fox's mechanic's

liens are invalid, we further conclude that neither is entitled to receive an award of appellate attorney's fees under the IMLS.

[86] Signworks limits its request for appellate attorney's fees to EdgeRock, claiming that "[a]lthough Edge[R]ock has appealed no issues as to Signworks, this appeal is still part of Signworks'[s] efforts to collect the debt owed by" EdgeRock. Signworks's Appellee's Br. p. 17. Signworks does not have a mechanic's lien against EdgeRock's property and is therefore not entitled to an award of appellate attorney's fees under the IMLS. Moreover, while Indiana Appellate Rule 66(E) provides that this court may assess damages, including an award of appellate attorney's fees, if an appeal is frivolous or in bad faith, we "use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal." *Kelley v. Kelley*, 158 N.E.3d 396, 400 (Ind. Ct. App. 2020). Given the complexity of the claims presented on appeal, we cannot say that Signworks is entitled to an award of appellate attorney's fees under Appellate Rule 66(E).

## Conclusion

[87] In sum, we conclude as follows: (1) Garmong's and Fox's mechanic's liens are invalid as to both ZPS's property and EdgeRock's property, (2) the trial court erred in including the value of uninstalled materials in Signworks's mechanic's lien against ZPS's property and the trial court's *in rem* judgment against ZPS should be reduced by that amount, (3) the trial court erred in ordering ZPS to pay Signworks prejudgment interest, (4) the First Bank Mortgage has priority

over all remaining encumbrances on EdgeRock's property that are at issue in the instant appeal, (5) the trial court did not err in denying EdgeRock's motion for summary judgment with regard to Change Order 3 or in granting summary judgment in favor of Garmong with regard to the scope-of-work question, (6) distribution of the RIF Funds is stayed pending a ruling by the Hamilton Commercial Court in Cause No. PL-5088 regarding priority of the secured interests in the funds and any future ruling from this court regarding the RIF Funds should be consistent with that of the Hamilton Commercial Court, (7) First Bank is entitled to an award of attorney's fees pursuant to the terms of the First Bank Mortgage, and (8) neither Garmong, Fox, nor Signworks is entitled to an award of appellate attorney's fees. In reaching these conclusions, we reiterate that our conclusions do not affect the monetary judgments entered against EdgeRock on Garmong's, Fox's, and Signworks's breach-of-contract claims and those judgments remain in effect. On remand, we instruct the trial court to enter an amended judgment consistent with this opinion.

[88] The judgment of the trial court is affirmed in part, reversed in part, and the matter is remanded with instructions.

Riley, J., and Weissmann, J., concur.